**UNITED STATES of America, Appellee,**

v.

**Joseph CALABRO et al., Appellants.**

Nos. 835, 839–841, 846–849, Dockets 72–1203, 72–1211–17.

United States Court of Appeals, Second Circuit.

Argued June 30, 1972.

Decided Sept. 21, 1972.

Joseph Aronstein, New York City, for appellant Calabro.

Jack Kaplan, New York City (John D. LaSalle, James E. Massey, Mark K. Sisitsky and Richard A. Toomey, Jr., New York City, of counsel), for appellant Leonard Conforti.

Donald E. Nawi, New York City, for appellant John Conforti.

William Sonenshine, Brooklyn, N. Y. (Evseroff, Newman & Sonenshine, Brooklyn, N. Y.), for appellant Anthony Tortorello.

Theodore Krieger, New York City, for appellants Anthony Picciano, Richard Pasqua, John Roche and Marc Moskowitz.

Marshall Tamor Golding, Atty., U. S. Dept. of Justice, Washington, D. C., Robert A. Morse, U. S. Atty., E. D. New York, Liam S. Coonan, Sp. Atty., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before MOORE, SMITH and TIMBERS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

The testimony at this lengthy, multi-defendant trial revealed the existence of a large, well-organized, long-term scheme to "pass dirty paper," that is, to forge and cash stolen obligations of various sorts in and around the New York area. Each of the eight appellants was convicted on one or more counts of forging and uttering United States Series E Savings Bonds and United States postal money orders, in violation of 18 U.S.C. § 495 or of conspiring to commit those offenses, in violation of 18 U.S.C. § 371, after a trial by jury in the United States District Court for the Eastern District of New York (Jacob Mishler, *Chief Judge.*) [1] Seven of the appellants were

---

1. The first count charged all defendants with conspiracy to violate 18 U.S.C. § 495 "by conspiring and agreeing to forge and to utter and publish as true U. S. Series E Savings Bonds and United States Postal Money Orders, with intent to defraud the United States, knowing the same to have been falsely made and forged." There were twenty-six paired counts (numbers two through twenty-seven) under § 495, charging, respectively, the forging and uttering of specific instruments; counts two

sentenced to terms of imprisonment, ranging in length from a year and a day to ten years; one was placed on probation.[2] Two co-defendants, Charles Graham and Richard Marabetti, pleaded guilty and testified for the government at trial. A ninth co-defendant found guilty, Joseph Chilli, did not appeal. Certain of the defendants claim that the evidence was insufficient to convict them, and all claim that numerous errors, some of constitutional magnitude, occurred during the course of the trial. We find that none of the claims warrants reversal and affirm the judgment below.

## I. THE FACTS

The testimony, primarily by Graham and Marabetti, longtime accomplices of the defendants, and by Martha Lane, Faye Rushford, Marie Matthews, and Carol Rabinow, women who played a more fleeting role in the organization, revealed that Leonard Conforti (sometimes referred to herein as "Leonard") and Steven Insalaco (a co-defendant who pleaded guilty during trial and whose case was then severed) were managers of a large "business" which forged and uttered stolen obligations; this indictment covers transactions in postal money orders and valid executed and blank unexecuted Series E Savings Bonds. The organization was multi-leveled; at the top were Leonard and Insalaco, who directed the operation and took a percentage of all proceeds from the cashing of the bonds and money orders. Most of the

paper was purchased outright or on consignment from Joseph Calabro, though some drifted in from other sources. Calabro was referred to by Leonard and Insalaco as "the boss," who got "a cut of all the action." The middle level in the organization was comprised of "managers," who recruited the men or women who did the actual passing, supervised their activity, and were responsible for their profits. Marabetti was active at this level, operating mainly in New Jersey; Graham, Richard Pasqua and John Roche worked in New York. John Conforti had a position somewhere between this level and the higher one; though he entered the conspiracy later than the others, he was being primed for a leadership role in the enterprise.

The "movers" or "workers," who did the actual cashing of the bonds, were generally young women, although men, such as Marc Moskowitz, were also employed. Faye Rushford, Martha Lane, Marie Matthews, and Carol Rabinow, four such "movers" who testified at trial, were sometimes paid a percentage of the amounts they cashed (10–15%) and sometimes received a stated amount for a day of cashing activity. The managers then took their share of the proceeds (from 10 to 35% depending on the person involved and the circumstances of the transaction) and passed the remainder on to Leonard and Insalaco. When the bonds were received on consignment, the supplier would be paid a percentage of the cash realized; Calabro took 17% on

and three specified four postal money orders and the others named specific Series E Savings Bonds. A twenty-eighth count charging John Conforti and his wife Loretta with a violation of 18 U.S.C. § 494 was dismissed by the court for lack of evidence.

All of the appellants except Anthony Tortorello were convicted on the conspiracy count. Leonard Conforti, named in all twenty-six substantive counts; John Conforti, named in fourteen, Marc Moskowitz, in six and Anthony Picciano, in two, were convicted on all counts charged. Tortorello was acquitted on eighteen of the twenty-four substantive counts in which he was named and John Roche was

acquitted on two of the eight in which he was charged. Joseph Calabro, charged on two substantive counts dismissed at the start of the government's case, and Richard Pasqua were convicted of conspiracy only.

2. Leonard Conforti, John Conforti, and John Roche were sentenced to ten years imprisonment; Leonard was also fined $26,000. Joseph Calabro was sentenced to a five-year prison term and was fined $10,000. Richard Pasqua and Marc Moskowitz were each sentenced to five-year terms; Anthony Tortorello was sentenced to a year and a day, and Anthony Picciano was placed on probation.

those obligations he supplied. To facilitate the passing of the obligations, Leonard and Insalaco purchased and supplied the managers with bogus identification papers, such as driver's licenses, draft cards, and Social Security cards; the major source of such papers was Tortorello, though Picciano also supplied some bogus identification.

The conspiracy was alleged to have run from July 1, 1966 to the filing of the indictment on March 11, 1970. Most of the incidents testified to occurred during 1967 and 1968; there was, however, proof of three episodes of cashing Savings Bonds during the summer of 1966. Michael Conforti, another brother of Leonard and John, Steven Insalaco, and Carol Rabinow were involved in those incidents. The bonds were cashed in banks in New York City; Rabinow, who did the actual cashing, received 10% of the proceeds and passed the rest to Conforti or Insalaco. Rabinow was arrested in late summer of 1966 and her involvement with the group ended at that point.

The next major series of transactions testified to occurred a year later, in the fall of 1967. In October of that year, Leonard Conforti learned of the possibility of purchasing stolen postal money orders; he and Insalaco approached Marabetti with an offer to work together cashing the orders. Leonard bought the obligations, which had been stolen from a Groveville, New Jersey post office, and the stamping machine necessary to validate them, and the three commenced forging and cashing them. Martha Lane, the woman who worked for Marabetti and actually cashed the forged orders, testified that the cashing forays began at the Black Eagle Social Club, on 31st Street in Brooklyn, the central location for the group's activities at this time. She would depart from there, generally with Marabetti, and often with Pasqua or Roche too, and drive to a series of retail stores, at each of which she would buy $20–$30 of merchandise and pay with a forged $100 money order. She was given false identification by Leonard Conforti before she left the club and

returned it to him after each trip. On returning to the Black Eagle, she gave the proceeds of the cashing to Leonard, Insalaco or Marabetti; when the merchandise purchased was liquor, it was generally used in the club. The money order activities were brought to an abrupt halt when Lane was arrested in Bergenfield, New Jersey on December 10, 1967.

Lane was immediately released on bail and testified that she was present at a conversation the day after her arrest in which Leonard and Insalaco discussed with Marabetti the possibility of venturing into United States Series E Savings Bonds instead of continuing with money orders. Marabetti and a partner of his, John Collerone, worked with Leonard, Insalaco and Pasqua during most of 1968, cashing such bonds at banks. Martha Lane, who cashed several thousand dollars worth of these bonds with Marabetti through May of 1968, testified to numerous cashing expeditions onto Long Island and in the areas surrounding New York City. During this period, she saw Calabro, described to her by Roche as "an associate of Leo and Steve's," at the Black Eagle on one occasion.

At the same time, Graham, who had been recruited in January of 1968, was building an organization of his own which also moved forged bonds dispensed by Leonard. The bonds cashed during this period were valid executed bonds stolen from the true owners and purchased from Calabro, and the "movers" forged the endorsements of the true owners when they cashed the bonds. Graham continued to work with Leonard and Insalaco during the summer of 1968, and at that time, John Conforti was first linked with the cashing activities. In the early fall, John allowed Leonard and others to use his house for typing blank bonds and apparently did some typing himself. Faye Rushford, a waitress who had come to New York in early fall on Leonard's invitation to work in Nero's Nook, a bar he operated which many of the appellants frequented, testified that John told her, a week after her arrival

at the start of October, that "We steal for a living. We get bonds."

During October Leonard reportedly told Graham to teach John the business, and John recruited Rushford to work with Graham and himself. In October, Rushford cashed bonds with Graham several times, and in December, John and Graham completed the cashing of a large number of blank bonds stolen from a post office in California. Graham testified that the identification used to facilitate the cashing of several series of the bonds moved in late 1968 and listed in the indictment was supplied by Tortorello. In January of 1969, John and Graham took several trips—to Pennsylvania to collect money from Moskowitz, who had been cashing bonds there, and to Boston to investigate the possibility of establishing operations there. During that same month, Leonard told Graham to make John his partner; they were to split the profits equally.

The last set of ventures probed at trial occurred during the fall of 1969. Marie Matthews met Pasqua and Leonard at this time and worked with them on several occasions cashing bonds in banks on the west side of Manhattan; she testified that she earned about $3,000, which was 15% of the total proceeds of the work, in her 20 to 30 trips with Leonard and Pasqua. Matthews was arrested on December 4, 1969.

Finally, Marabetti testified that when he was released from jail in January of 1970, having completed a term on a related charge, he met with Leonard who told him that if he wanted to do any more work in the "bond business," he should see John, who was taking it over for Leonard.

## II. SUFFICIENCY OF THE EVIDENCE

 Three appellants challenge the sufficiency of the evidence to support their convictions. Preliminarily, Calabro and John Conforti make a broad attack on the conformity of the evidence with the offenses charged in the indictment. John contends that a Series E bond is not embraced within the wording of 18 U.S.C. § 495 and Calabro argues that the forgery of endorsements on otherwise genuine bonds does not violate that section. Neither contention has merit. Section 495 prohibits, *inter alia*, the making, alteration, forgery or counterfeiting of "any deed, power of attorney, order, certificate, receipt, contract, or other writing" for the purpose of obtaining money from the United States and the publishing or uttering of any such writing with intent to defraud the United States, knowing the false or forged nature of the paper. In Prussian v. United States, 282 U.S. 675, 51 S.Ct. 223, 75 L.Ed. 610 (1931) the Supreme Court held, under the predecessor to § 495, that an endorsement is a "writing" within the purview of that section. And a forged endorsement on an obligation such as a government savings bond, if made "for the purpose of obtaining a sum of money from the Treasury of the United States," constitutes a violation of § 495. Prussian v. United States, *supra*; United States v. Campo, 414 F.2d 765 (2d Cir. 1969). Each of the forgery counts charged that the endorsements were forged for the purpose of obtaining money from the United States and each of the uttering counts charged that the passing was done "with intent to defraud the United States, knowing the payee's name to be forged thereon." Hence the acts alleged and proved fell within the scope of § 495.

 The conspiracy count, worded somewhat differently, charged a conspiracy to forge and utter bonds and money orders, known to have been forged, with intent to defraud the United States. Read literally, this does not charge a conspiracy to forge endorsements. *See* Danielson v. United States, 321 F.2d 441, 444 (9th Cir. 1963). However, the evidence showed a conspiracy to forge bonds themselves as well as to forge endorsements on valid bonds. Some of the bonds supplied by Calabro and cashed by the group were blank and had to be completed and stamped to have even counterfeit validity. Despite the genuineness of the blanks from which

the defendants worked, this process is a forgery of the bonds in violation of 18 U.S.C. § 471 which prohibits forging of an "obligation or other security of the United States," and their uttering constitutes a violation of 18 U.S.C. § 472. *See* United States v. Craft, 407 F.2d 1065 (6th Cir. 1969). Thus, a conspiracy to violate sections 471 and 472 was charged, even if we take a possibly overtechnical view and find that one under § 495 was not, and the evidence sustained the charges. The fact that the wrong section of the statute was cited does not invalidate either the charge or the convictions if, as here, no prejudice is shown to derive from the miscitation. United States v. Hutcheson, 312 U.S. 219, 229, 61 S.Ct. 463, 85 L.Ed. 788 (1941); United States v. Galgano, 281 F.2d 908, 910–911 (2d Cir. 1960), cert. denied sub nom. Carminati v. United States, 366 U.S. 960, 81 S.Ct. 1916, 6 L.Ed.2d 1253 (1961); United States v. McKnight, 253 F.2d 817, 820 (2d Cir. 1958); Rule 7(c) Fed.R.Crim.P.[3]

■ Calabro, who was convicted only on the conspiracy count, claims that though he may have been guilty of aiding the forging and uttering by selling bonds to Leonard and Graham, he did not conspire with the defendants to accomplish their aims. However, it is clear that his participation went deeper than the supplying of contraband in a few isolated transactions with no concern for the remainder of the operation. *See* United States v. Peoni, 100 F.2d 401 (2d Cir. 1938). He was the supplier of most of the bonds the group cashed, and though he was paid for some irrespective of whether they were cashed, he often received a percentage of the proceeds. The forging and uttering were thus a pre-

requisite to his realization of profit. Both Marabetti and Graham, who personally received packages of bonds from Calabro, were told by Leonard that Calabro was his boss, and Calabro himself told Faye Rushford that Leonard and Insalaco "worked for him." There was ample evidence that Calabro was a key member of the ongoing conspiracy.

■ John Conforti claims that he was a "fringe" defendant who entered the conspiracy late and was only tangentially involved in the transactions that occurred after he began to participate. The evidence, as noted above, belies this contention. In the early fall of 1968 he recruited Faye Rushford, telling her that the group cashed stolen bonds for a living, and he allowed his house to be used for the forging enterprise. In the late fall of 1968 and early winter of 1969, a period of particularly heavy cashing activity, John became Graham's partner and worked actively with the group. Thus, although John entered the conspiracy later than the others, the evidence was sufficient to sustain his conviction on the conspiracy count. His convictions on the substantive counts are also clearly sustainable. He assisted in the completion of the blank bonds the subject of counts 22 through 27 and received a share of the proceeds from their cashing; he aided and abetted the forging and uttering of the bonds listed in counts 14 and 15 by recruiting the woman who cashed them. On the other six counts on which he was convicted, the jury could have found him an aider and abettor because he was a member of the conspiracy at the time when the named bonds were passed. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

3. John claims that prejudice flowed from the use of § 495 on the substantive counts based on the blank savings bonds when those counts could as well have been brought under § 471. The claim is meritless for sections 471 and 472 bear higher penalties than does § 495. Roche and Leonard Conforti, who could have been charged with forging postal money orders under 18 U.S.C. § 500 rather than with forging endorsements and uttering orders with forged endorsements under § 495, would then have been exposed to a five-year as opposed to the ten-year maximum term they faced. However, Roche was only sentenced to five years, and Leonard received ten-year terms to be served concurrently with twenty-four other terms of equal length.

■ Tortorello also attacks the sufficiency of the evidence implicating him; he claims that even if the jury credited a statement by Graham that he was the source of twenty or more sets of false identification used to facilitate the passing of the bonds, there was no evidence that he knew when he supplied the papers that they would be used in bond-cashing activity. Under United States v. Gallishaw, 428 F.2d 760 (2d Cir. 1970), the government had to show at a minimum, to sustain the conviction of Tortorello as an aider and abettor of the forging, that he knew that the identification he supplied the group was to be used in a transaction involving forged bonds. Though details of the actual cashing would not have to be known to him, a generalized suspicion of illegal use of the identification would not suffice.

■ The court properly instructed the jury on this point, noting that on each substantive count the jury must find that "the act of participation was done by the particular individual knowing it was for the purpose of furthering that particular venture set forth in the count" and that the requisite intent "must include the knowledge that it was for the purpose of forging or cashing" the bonds or money orders. Existence of this knowledge can be "inferred from the circumstances," United States v. Gallishaw, *supra*, 428 F.2d at 763, and though the evidence on this point was not abundant, it was sufficient to allow the jury to conclude that Tortorello knew that cashing of illegal obligations was being accomplished with the false papers he sold the defendants. Leonard introduced Tortorello to Marabetti as "the Tortie that gives us the identification." Whenever the enterprise ran short of identification, Leonard would tell Roche to notify Tortorello and pick up more from him; the latter brought a batch of driver's licenses, Social Security cards and draft cards to Nero's Nook one night in July, 1968. At the time of one sale of identification directly to Marabetti Tortorello indicated that he was familiar with Calabro and knew that he had au-thorized the transaction. These circumstances could provide the basis for an inference that Tortorello was well acquainted with the appellants' activities and knew that their venture involved the cashing of forged obligations. *See* United States v. Howell, 447 F.2d 1114 (2d Cir. 1971).

## III. MULTIPLE CONSPIRACIES

■ John and Calabro complain that the evidence showed multiple discrete conspiracies rather than the one charged in the indictment, and John claims that the court ought to have severed his trial from that of those involved in different agreements. The evidence, however, quite clearly established one conspiracy, extending over a three-year period, to forge and pass savings bonds, money orders, and obligations of other sorts, including municipal bonds, through an on-going network. The method of operation, the participating individuals at the middle and upper levels, and the goals of the parties to the continuing agreement remained steady throughout. Leonard and Insalaco operated the business; Roche, Pasqua, Marabetti and Graham were middle level "employees" through the money order and bond phases of the group's activities. John occupied a position somewhere between the two groups, and Calabro was the supplier; though John became a member after the money order phase had terminated, and though Calabro did not supply the money orders, neither John's entry nor Calabro's resumption of supply activities after the money order hiatus marked a new agreement by the group or a change in method of operation. Though the "movers" who did the actual cashing came and went over the years, the basic network continued intact throughout the entire period.

This group of forgers in fact exhibited the characteristics of the typical "chain" conspiracy; although all of the defendants may not have known and worked directly with all the others, there is evidence that each was aware of others in the line of distribution and of the larger

nature of the operation in which he or she played a part. *See* Note, Federal Treatment of Multiple Conspiracies, 57 Colum.L.Rev. 387, 390–92 (1957); United States v. Borelli, 336 F.2d 376 (2d Cir. 1964). This is not a situation similar to that in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) in which numerous individuals, unconnected and unconcerned with one another, were tied solely to each one's involvement with one Brown. Here, the appellants were members of a large organization which they had joined with knowledge of its goals and with an intent to further them. John and Calabro were central members of this conspiratorial group.

Moreover, even if one concluded that two conspiracies were shown, one to forge postal money orders in the fall of 1967 and one of longer duration turning on savings bonds, John would not benefit thereby. "[T]he test for reversible error, if two conspiracies have been established instead of one, is whether the variance affects substantial rights. Fed.R.Crim.P. 52(a)." United States v. Agueci, 310 F.2d 817, 827 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); United States v. Vega, 458 F.2d 1234 (2d Cir. 1972). The requirements for sustaining a verdict in which there has been a variance have been met when there is no double jeopardy problem and no issue of unfair surprise deriving from the proof of two conspiracies rather than one (Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)), and when "[t]he several conspiracies, if there had been such, could have been joined in a single indictment or consolidated for a single trial and the conduct of the trial was such that the danger resulting from the admission of evidence not chargeable to any appellant was minimal." United States v. Agueci, *supra*, 310 F.2d at 827.

John claims that he did suffer prejudice from the inclusion of the postal money order conspiracy in his trial because it provoked testimony about the use of threats and physical force by Leonard on one of the money order "movers" to make clear to her that she was not free to cease working for him whenever she pleased. John also claims that proof on the money order counts distracted the jury from the counts and testimony in which he was involved. Proof on the money order counts, which comprised only two of the twenty-six substantive counts, did not unduly side track the trial, and the fleeting reference to physical violence in a trial of a month's duration does not warrant a severance. Nor was John a peripheral defendant, like Shuck in United States v. Kelly, 349 F.2d 720 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), whose connection to the overall conspiracy was so tenuous and different in quality from that of the main defendants that excessive care was necessary to avoid irreparable prejudice to him deriving merely from presence on trial with them. The trial court here took pains to explain to the jury the circumstances under which the evidence could be considered against one or more of the defendants and to avoid any prejudice to those defendants against whom certain facts were not admissible. We find no error based on a claim of the existence or proof of more than one conspiracy under the indictment.

## IV. ALLEGED DENIAL OF THE RIGHT TO ASSISTANCE OF COUNSEL

The two most substantial arguments raised by the appellants arise from the alleged denial of assistance of counsel to Leonard Conforti and Joseph Calabro.

The factual background of Leonard's claim must be sketched in some detail. Conforti's retained attorney in a related case, James LaRossa, was to represent him at this trial, but when it became clear that he would be a crucial witness in a hearing on an alleged promise of immunity to Leonard, he was relieved by the court and Gerald Rosenthal was appointed to replace him. This substitution took place some time before trial, and the two had opportunities to talk about the defense in the interim. On

the eve of trial, Rosenthal was appointed to represent John Conforti and his wife Loretta, named in one count dismissed at trial.

The conflict which led to Rosenthal's cessation of representation of Leonard grew out of Leonard's refusal to stipulate that the bonds named in certain counts of the indictment were in fact stolen and the signatures unauthorized. The government and all the other defendants and attorneys were willing, indeed anxious to do so, both to save time and to avoid highly prejudicial testimony. At the end of the first day of testimony by bondholders, Rosenthal announced to the court that Leonard was dissatisfied and wanted him removed from the case. Leonard objected, claiming that though they were having some difficulty, it was Rosenthal and not he who wished to sever the relationship. The court forbade Rosenthal to withdraw but advised the defendant that if he wished to dismiss his attorney he could do so and proceed pro se, with Rosenthal present to answer his questions. Rosenthal finally stated that he would insist on entering the stipulation were he to continue with Leonard and leave it to the client whether to accept or dismiss him for that reason. Leonard remained adamant in his refusal to stipulate, and the court announced that the testimony of bondholders would continue the next day and that Rosenthal would be present to represent Leonard.

The next morning Rosenthal reiterated that Leonard and now John wished to dismiss him. Leonard explained that Rosenthal's unwillingness to tell the court that it had been he who initiated the talk of dismissal, and his refusal to "properly defend" his client were the reasons for the request. Leonard told the court that he did not feel adequate

to defend himself but that he would prefer that course to continuing with Rosenthal. The court denied Leonard's request for a half-day recess in which to obtain new counsel and gave him the choice of Rosenthal or self-representation. Leonard, followed by John and Loretta, chose the latter. The court did not discuss the matter further at that time, but told them they would have every courtroom right an attorney has and "one additional right, the right to make a fool of yourself by not having a lawyer." The trial proceeded.

Early the next morning Leonard, having contacted another lawyer but failed to persuade him to take the case on such short notice, requested that the court appoint new counsel for him. Judge Mishler refused, citing the inevitable delay that would follow the entry of new assigned counsel into the case. When no other defense attorney present volunteered to represent the Confortis, the court insisted that it was Rosenthal or no one.[4] John and Loretta then accepted the reassignment of the attorney; Leonard chose to continue pro se. After he had conducted what could only be described as a disastrous cross-examination of one of the female witnesses, the court advised Leonard of some of the difficulties of pro se defense and reminded him of his continuing offer to reassign Rosenthal. Leonard refused the attorney's services and did a creditable job of representing himself throughout the remainder of the trial, conferring with Rosenthal and other attorneys when necessary.

Leonard really makes two claims—that he did not effectively waive the assistance of counsel and that the court erred in refusing to assign new counsel or to allow Leonard time to locate an attorney on his own. He claims that he made no

---

4. The possibility that Leonard would agree to have Rosenthal reassigned had been lessened the previous afternoon when the attorney had mentioned to the court a fee dispute that he and Leonard were having in another case, thus suggesting that Leonard's claims of indigency were less than genuine. This apparent discrepancy in

financial condition was explained to the court's satisfaction, however, and by this time (the morning of the second day of self-representation) Rosenthal had expressed his willingness to defend the Confortis vigorously if they would accept his reassignment.

"clear cut election" to waive his constitutional right to assistance of counsel because his request that Rosenthal withdraw did not follow "a full and calm discussion between the judge and the defendant" (United States v. Spencer, 439 F.2d 1047, 1050 (2d Cir. 1971)) with emphasis on "the risk, pitfalls and complexities inherent in [pro se representation] and the serious consequences of conviction," United States v. Duty, 447 F.2d 449, 451 (2d Cir. 1971). Although it is true that the trial court did not, at the moment of Leonard's request, discuss as fully as would have been desirable the consequences of his acts, we are convinced that Leonard intelligently and knowingly waived his right to counsel "even without such a caveat." United States v. Duty, *supra*, 447 F.2d at 451.

■ The decision on whether a defendant has effectively waived his Sixth Amendment right to counsel depends "in each case, upon the particular facts and circumstances surrounding that case, including the backgound, experience, and conduct of the accused." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The factors that this court has considered in making that determination are "whether the defendant understood that he had a choice between proceeding pro se and with assigned counsel, whether the defendant understood the advantages of having one trained in the law to represent him, and whether the defendant had the capacity to make an intelligent choice." United States v. Spencer, *supra*, 439 F.2d at 1050. The fact that the defendant's pro se representation turned out to be inadequate and ineffective is irrelevant to the issue of whether the waiver of his right to counsel was knowingly or intelligently made, but it is important that the court consider whether the defendant affirmatively made a choice or whether he proceeded alone

only because he felt "he had no choice" and thus did not effectively waive his right. *See* United States ex rel. Higgins v. Fay, 364 F.2d 219 (2d Cir. 1966); United States v. Curtiss, 330 F.2d 278 (2d Cir. 1964). The trial court must make a "record sufficient to establish to our satisfaction that the defendant 'knows what he is doing and his choice is made with eyes open.' United States v. Plattner, 330 F.2d 271, 276 (2d Cir. 1964)." United States ex rel. Higgins v. Fay, *supra*, 364 F.2d at 222.

■ The record here makes clear that under this test for intelligent waiver Leonard did choose to forego Rosenthal's assistance. When he stated that he no longer desired the services of the attorney, the court conveyed to him the danger and folly of proceeding alone. And during the second day of self-representation, the court warned him more explicitly of the perils of cross-examination by one not seasoned by trial work. The court also had ample time to observe Leonard and to assess his capacity to choose pro se defense, and we concur in his conclusion that Leonard was intelligent and well understood the consequences of his acts. Though he expressed his own sense of inability to defend himself effectively, he willingly proceeded alone, preferring his own limitations to those he felt Rosenthal possessed.[5]

■ As a subsidiary or alternative to the waiver argument, Leonard urges that Rosenthal deserted him rather than the reverse, by stating that he intended to enter into the stipulation contrary to his client's wishes. Leonard's claim that this was an improper act which justified the dismissal is unfounded. The American Bar Association Project on Standards for Criminal Justice concludes that a defendant is entitled to make the ultimate decision only in regard to whether to plead guilty, whether to waive a jury, and whether to testify; "all other stra-

---

5. The trial court, once Leonard had waived counsel, followed the practice approved in United States v. Spencer, *supra*, of offering the defendant the assistance of Rosenthal as a resource to answer questions and give advice should the defendant request it. Rosenthal was always present in the courtroom during trial, and Leonard apparently conferred with him and other defense attorneys on occasion.

tegic and tactical decisions are the exclusive province of the lawyer after consultation with his client." Standards Relating to the Prosecution Function and the Defense Function, approved draft 1971, The Defense Function § 5.2. The decision on "whether to stipulate to certain facts" falls into the latter category. *Id.* p. 240; *see* People v. Woods, 23 Ill.2d 471, 179 N.E.2d 11 (1961). *See generally* United States v. Main, 443 F.2d 900 (9th Cir. 1971), cert. denied 404 U.S. 958, 92 S.Ct. 328, 30 L.Ed.2d 276 (1972); United States v. Gutterman, 147 F.2d 540 (2d Cir. 1945).

In any case, the trial judge refused to allow Rosenthal to withdraw because of this difference over strategy and Rosenthal expressed his willingness to resume representation of Leonard even should he persist in his refusal to stipulate. The trial judge, present in the courtroom and aware of nuances which the record cannot convey, was persuaded, we think reasonably, that Leonard was "determined to take charge of his defense, with and without a lawyer"; he now "has no just reason to complain of lack of counsel" (Glenn v. United States, 303 F.2d 536, 540–541 (5th Cir. 1962), cert. denied sub nom. Everitt v. United States, 372 U.S. 920, 83 S.Ct. 734, 9 L.Ed.2d 725 (1963)) for this was "a situation for which he was intentionally and knowingly responsible." Kates v. Nelson, 435 F.2d 1085, 1088 (9th Cir. 1970).

The second branch of Leonard's argument, closely entwined with the first, is that the court ought to have assigned new counsel once Leonard had dismissed Rosenthal. Once trial has begun, however, a defendant does not have the unbridled right to reject assigned counsel and demand another. United States v. Burkeen, 355 F.2d 241 (6th Cir.), cert. denied sub nom. Matlock v. United States, 384 U.S. 957, 86 S.Ct. 1582, 16 L.Ed.2d 553 (1966); United States v. Paccione, 224 F.2d 801 (2d Cir.), cert. denied, 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955). A defendant with assigned counsel cannot decide for no good cause on the eve or in the middle of trial that he will have another attorney represent him. *Cf.* United States v. Abbamonte, 348 F.2d 700 (2d Cir. 1965), cert. denied, 382 U.S. 982, 86 S.Ct. 557, 15 L.Ed.2d 472 (1966) (retained counsel). While courts must be assiduous in their defense of an accused's right to counsel, that right may not be "manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." United States v. Bentvena, 319 F.2d 916, 936 (2d Cir.), cert. denied sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); *see* United States v. Terry, 449 F.2d 727 (5th Cir. 1971); United States v. Llanes, 374 F.2d 712 (2d Cir.), cert. denied, 388 U.S. 917, 87 S.Ct. 2132, 18 L.Ed.2d 1358 (1967).

In order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict. Brown v. Craven, 424 F.2d 1166 (9th Cir. 1970); United States v. Grow, 394 F.2d 182, 209 (4th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968); United States v. Gutterman, 147 F.2d 540 (2d Cir. 1945). If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right. Brown v. Craven, *supra*. In the absence of a conflict which presents such a Sixth Amendment problem, the trial court has discretion to decide whether to grant a continuance during the course of trial for the substitution of counsel, and that decision will be reversed only if the court has abused its discretion. United States v. Main, *supra*; United States v. Grow, *supra*.

In this case, we conclude that Leonard had no justification for his request for new counsel. Rosenthal's action regarding the stipulation was not

improper, and he showed himself willing to accommodate to his client's strongly felt wishes. The attorney had been assigned before trial, and the two had discussed the case; there was no inability to communicate. Nor was the verdict unjust. We therefore find that the trial court, which may have been only too aware that a decision to honor Leonard's request would not only delay a complex trial but would produce a rash of dissatisfaction with lawyers on the part of the other defendants, did not abuse its discretion in denying Leonard's request.

Leonard calls our attention to the recent case of United States v. Morrissey, 461 F.2d 666 (2d Cir. 1972) but that case is readily distinguishable and only strengthens our conclusion. There, Morrissey had petitioned the court four times before trial for a substitution of counsel. An adjournment to effect a change of counsel would not have engendered as much delay as had already occurred through no fault of the defendant. The defendant gave reasons for his wish which, if true, would have been good cause for a change of attorney. In this case, the first sign of dissatisfaction came during trial, revolved around an issue of trial strategy which was easily resolved, and was probed by the court, conscious of the inevitable delay a switch would entail. The court's conclusion in *Morrissey* is peculiarly apt here: "In sum, the record as a whole indicates that [Leonard's] reasons for a change of counsel were insubstantial. Thus, the trial court's proposed alternative to [Leonard] of representing himself or continuing [Rosenthal] as counsel was proper." United States v. Morrissey, *supra*, 461 F.2d at 670.

Pasqua, Roche, Picciano, Moskowitz, and John Conforti claim that as a result of Leonard's antics the jury could only have viewed the trial as a "macabre charade" and that his pro se defense made it impossible for them to obtain a fair trial. They claim that the trial court erred in denying their repeated requests for severance and mistrial. The nub of their complaint is that through inept questioning on cross-examination and incessant flamboyance and posturing Leonard revealed damaging facts and brought out relationships among the female witnesses and the defendants, knowledge of which created jury compassion for the witnesses and ill will toward the defendants.

Motions for severance and mistrial are directed to the sound discretion of the trial court. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Marshall, 458 F.2d 446 (2d Cir. 1972); United States v. Kompinski, 373 F.2d 429 (2d Cir. 1967); United States v. Bentvena, *supra*. Before a defendant is entitled to severance he must show that substantial prejudice derives from the joint trial and not merely that he would have had a better chance of acquittal were he tried separately. United States v. Borelli, 435 F.2d 500 (2d Cir. 1970), cert. denied, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971); United States v. DeSapio, 435 F.2d 272 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); Note, Joint and Single Trials under Rules 8 and 14 of the Federal Rules of Criminal Procedure, 74 Yale L.J. 553, 562–66 (1965).

Tested against this standard, it is clear that the decision of the court below was correct. The inquiries on cross-examination, none of which was objected to in an attempt to halt Leonard's ill-advised course, were not as likely to cause spill-over prejudice as the disruptive outbursts in United States v. Bentvena, *supra;* United States v. Marshall, *supra;* and United States v. Aviles, 274 F.2d 179 (2d Cir.), cert. denied sub nom. Genovese v. United States, 362 U.S. 974, 80 S.Ct. 1059, 4 L.Ed.2d 1010 (1960); the fit thrown by the insane co-defendant in Brown v. United States, 126 U.S.App. D.C. 134, 375 F.2d 310 (1966), cert. denied, 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed. 2d 1359 (1967); or the presence of the manacled co-defendant in McDonald v. United States, 89 F.2d 128 (8th Cir.), cert. denied, 301 U.S. 697, 57 S.Ct. 925,

81 L.Ed. 1352 (1937), none of which was held to warrant severance or mistrial. Nor did any appellant here request ameliorative instructions which might have been appropriate. The difficulties of which these five defendants complain are not essentially different from those which any defendant might suffer in a joint trial if the efforts of counsel are not co-ordinated. *See, e. g.*, United States v. DeSapio, *supra*, 435 F.2d at 280–281. The denial of the motions for severance and mistrial was not an abuse of discretion.

Calabro's Sixth Amendment claim arose from an incident which occurred on the last day of trial, while the jury was deliberating into the evening. His attorney became ill in the courtroom and was taken to a hospital at approximately 10:45 p.m. The court then discussed the singular situation with Calabro, who expressed uncertainty about whether another attorney could competently represent him at that point. The court stated that he thought it would be fair for another to assume his defense temporarily but Calabro refused to make any decision, claiming that he "couldn't say" what ought to be done; he "didn't know really." Then, without requesting another defense attorney to represent Calabro for the remainder of the evening, the court allowed the proceedings to continue. During the absence of the attorney, the court received a note from the jury and delivered a supplemental charge to them. Shortly thereafter, at 11:20 p. m., the jury returned with its verdict, finding Calabro guilty on the conspiracy count and the others guilty, as set out in n. 1. The court polled the jury on the verdict. Before adjourning, the court advised Calabro to retain other counsel before the date of sentencing.

Calabro claims that this period of time during which he was unrepresented was a "critical stage" of the proceedings during which he had a right to counsel, and that he was therefore denied his constitutional rights under the Sixth Amendment. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The government suggests preliminarily that Calabro effectively waived his right to counsel by evasively refusing to answer the court directly but in making clear that he chose to proceed alone. We cannot find on the basis of the inconclusive conversation sketched above that the court clearly explained to Calabro his right to counsel and the possibility of his representing himself temporarily. Calabro seems to have been purposely unwilling to commit himself, but the court did not ask him pointblank which course of action he wished to take. Given the presumption against waiver of this fundamental constitutional right, we cannot conclude that Calabro knowingly and voluntarily waived the assistance of counsel.

■ However, in the particular circumstances present here, we conclude that Calabro was not exposed to any "reasonable possibility of prejudice in fact" (McGill v. United States, 121 U.S. App.D.C. 179, 348 F.2d 791 (1965), that no prejudice accrued to him as a result of the hour without counsel, and that the error was a harmless one.[6] First, the question put by the jury in its note was a repetition of an earlier question, asking whether a defendant could be acquitted on the conspiracy count and be convicted on any of the substantive charges. Unlike most of the other defendants, Calabro was charged only with conspiracy. Therefore, "the jury's question and the judge's answer had nothing whatever to do with the case against [him] or with his defense." Walker v. United States, 116 U.S.App.D.C. 221, 322 F.2d 434, 436 (1963), cert. denied, 375 U.S. 976, 84 S.Ct. 494, 11 L.Ed.2d 421 (1964).

6. "The general language in Johnson v. Zerbst and Rule 44 must be read in the light of their fundamental purpose to provide the guiding hand of counsel at every step where an accused who is without counsel may be prejudiced. . . .

The exaltation of abstraction above reality should not be condoned for the purpose of denying constitutional rights and should not be indulged for the purpose of creating constitutional rights." *McGill, supra,* 348 F.2d at 793.

Despite this fact, his attorney had been given an opportunity when the question was first asked to object to the suggested response and to offer language which the court adopted as part of its answer. He had then expressly found the answer unobjectionable. The repetition of the answer to this question could not have prejudiced Calabro.[7]

It is equally clear that there was no possibility of prejudice to Calabro because of his attorney's absence when the verdict was returned. Martin v. United States, 182 F.2d 225 (5th Cir.), cert. denied, 340 U.S. 892, 71 S.Ct. 200, 95 L.Ed. 647 (1950); see McGill v. United States, supra; cf. Newagon v. Swope, 183 F.2d 340 (9th Cir. 1950), cert. denied, 340 U.S. 921, 71 S.Ct. 352, 95 L.Ed. 665 (1951). The court here polled the jury on its own motion and thus removed the possibility of prejudice deriving from absence of polling which disturbed the court in Thomas v. Hunter, 153 F.2d 834 (10th Cir. 1946). In United States v. Smith, 411 F.2d 733 (6th Cir. 1969), the court found that even if the jury were polled, prejudice might creep in because counsel was not present to discern hesitancy of juror responses or other facts with "significant meaning." In that case, however, the defendant was tried alone; here the numerous attorneys whose clients' interests in the polling of the jury were identical to Calabro's insured against such a possibility. In Smith, also, the court did not discuss the situation with the defendant at all. See United States v. Clayton, 418 F.2d 1274 (6th Cir. 1969), cert. denied, 399 U.S. 931, 90 S.Ct. 2262, 26 L.Ed.2d 800 (1970). Though Calabro did not clearly waive counsel, the court did outline the situation to him and make it clear that he could get another attorney. This must have alerted him to be protective of his rights in the short period during which he was unrepresented. We therefore find the case distinguishable from Smith, but to the extent it is not, we decline to follow that holding. We therefore find no reversible error based on Calabro's short period without counsel. See United States v. Moher, 445 F.2d 584 (2d Cir. 1971); Dallago v. United States, 138 U.S.App.D.C. 276, 427 F.2d 546 (1969); United States v. Murphy, 413 F.2d 1129, 1140–1141 (6th Cir.), cert. denied, 396 U.S. 896, 90 S.Ct. 195, 24 L.Ed. 2d 174 (1969); cf. Chin Kee v. Commonwealth, 407 F.2d 10 (1st Cir.), cert. denied, 395 U.S. 982, 89 S.Ct. 2143, 23 L. Ed.2d 770 (1969).

The defendants raise numerous other points, none of which has merit. The court had reasonable non-hearsay grounds for finding the existence of a conspiracy and admitting the hearsay evidence of co-conspirators against the others. The evidence on passing of municipal bonds and other obligations was admissible either to show "similar acts" and mode of operation or as part of the same conspiracy charged in the indictment, although we note that it might have been wise to exclude it given the other clear and overwhelming evidence of the group's activities.

Finding, therefore, none of the claims made by appellants sufficient to warrant reversal, we affirm their convictions and refuse to disturb the verdict below.

---

7. This case is readily distinguishable from United States v. Glick, 463 F.2d 491 (2d Cir. 1972) in which the court delivered supplementary instructions to the jury outside the presence of the appellant (appearing pro se) and the attorney for his co-defendants. The instruction was not only directly relevant to the appellant's case, but was misleading and highly prejudicial. The court there found, as has been held in numerous other recent cases under Fed.R.Crim.P. 43 (which requires the presence of the defendant at all stages of the proceeding) that the defendant must show some prejudice or possibility of prejudice before a conviction will be set aside on the ground that the defendant, and often his attorney too, were absent during communication by the court with the jury. See United States v. Arriagada, 451 F.2d 487 (4th Cir. 1971); United States v. Howard, 433 F.2d 1 (5th Cir. 1970); United States v. Schor, 418 F.2d 26 (2d Cir. 1969); Ware v. United States, 376 F.2d 717 (7th Cir. 1967).