Cornelius LEWIS and Paul S. Erickson,
Plaintiffs-Appellants,

v.

Michael P. LANE, et al.,
Defendants-Appellees.

No. 85–2087.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1986.

Decided April 7, 1987.

Ruthanne DeWolfe, Sally T. Elson, Robert E. Lehrer, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs-appellants.

Gabriel M. Rodrigues, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before CUMMINGS and CUDAHY, Circuit Judges, and MAROVITZ, Senior District Judge.*

CUDAHY, Circuit Judge.

Plaintiffs-appellants (the "plaintiffs" or "appellants") appeal the magistrate's order

* Honorable Abraham L. Marovitz, Senior District Judge for the Northern District of Illinois, is sitting by designation.

granting summary judgment for defendants-appellees (the "defendants") as well as his order denying their motion to substitute counsel. We hold that the magistrate abused his discretion by not allowing the substitution of counsel and that plaintiffs may be able to raise genuine issues of material fact to withstand a summary judgment motion. Accordingly, we vacate the order granting summary judgment and remand with instructions that substitute counsel be appointed and be given the opportunity to file affidavits opposing the defendants' summary judgment motion.

## I.

The plaintiffs, Cornelius Lewis and Paul Erickson, are state prisoners confined on death row at Menard Correctional Center ("Menard"). On May 9, 1984, the District Court for the Southern District of Illinois granted Lewis and Erickson leave to proceed with this lawsuit *in forma pauperis.* The plaintiffs, who initially proceeded *pro se,* filed a section 1983 claim, 42 U.S.C. § 1983 (1982), against various prison administrators of the Illinois Department of Corrections.[1] The complaint charged that certain policies, procedures and conditions of confinement on Menard's death row constituted cruel and unusual punishment in violation of the eighth amendment. Complaint, *Lewis v. Lane,* No. 84-3113 (S.D.Ill. filed May 14, 1984). Specifically, the plaintiffs alleged that the prison administrators maintained the heat in their cells during the months of December 1983 and January 1984 at an unreasonably low temperature and that the prison guards' practice of tapping on the bars of the cells ostensibly to test their strength was adopted and implemented to harass the prisoners. The plain-

tiffs sought declaratory, injunctive and monetary relief. *Id.*

The parties consented to the referral of this case to a magistrate for decision and entry of final judgment. The plaintiffs moved for appointment of counsel, and the magistrate, acting under section 1915(d),[2] appointed Tom D. Adams, a member of the Southern District of Illinois bar, to represent both plaintiffs. When Adams learned of his appointment, he immediately asked the magistrate to be relieved of this duty because he did not believe that he was competent to handle a federal civil rights lawsuit involving constitutional issues. Adams' Deposition at 23, 25 (taken on March 26, 1986) ("Adams' Dep."). He also claimed that he did not have the time to devote to this case. *Id.* at 24–25. At the time of his appointment, Adams was a sole practitioner. *Id.* at 20–21. The magistrate did not find that any of Adams' proffered reasons excused him from taking this case. Adams eventually accepted the appointment after the magistrate indicated that his membership in the Southern District bar might be terminated if he declined the assignment. *Id.* at 25.

In August 1984, the defendant prison administrators filed their answer to the *pro se* complaint, asserting that the practice of testing bars was a reasonable security measure and that the heat in the condemned unit was not so inadequate as to constitute a violation of the eighth amendment. Answer, *Lewis v. Lane,* No. 84–3113 (S.D.Ill. filed Aug. 16, 1984).

On November 2, 1984, the plaintiffs filed a motion for substitution of counsel, or in the alternative, they requested that their suit be consolidated with another case challenging conditions on Menard's death row,

---

1. Michael Lane is the Director of the Illinois Department of Corrections. The remaining defendants are employees of that department.

2. Section 1915(a) and (d) provide in relevant part:

 (a) Any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees and costs or security therefor, by a person who makes affidavit that he

is unable to pay such costs or give security therefor. Such affidavit shall state the nature of the action, defense or appeal and affiant's belief that he is entitled to redress.

 . . . .

 (d) The court may request an attorney to represent any such person unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious.

28 U.S.C. § 1915(a), (d) (1982).

*Brisbon v. Lane,* No. 82–3335 (S.D.Ill. filed Oct. 18, 1982). The motion specifically requested that the court appoint in place of Adams the attorney who was handling the *Brisbon* case. In their motion, the plaintiffs complained about Adams' failure to file an amended complaint to raise additional issues or to clarify those already raised as well as his refusal to keep in touch with them. Motion for Substitution of Counsel ¶¶ 1–3, *Lewis v. Lane,* No. 84–3113 (S.D.Ill. filed Nov. 2, 1984).

Before the magistrate ruled on the motion to substitute, the defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). This motion asserted that the heat provided was adequate, that the prison administrators were not indifferent to the needs of the prisoners and that the bar-testing procedure was adopted when prison officials received information that one or more inmates were planning to escape by cutting through cell bars and the practice was thus a reasonable response to legitimate security needs. Motion to Dismiss, *Lewis v. Lane,* No. 84–3113 (S.D.Ill. filed Dec. 17, 1984).

The magistrate held a hearing on January 24, 1985 at which he considered both the motion to dismiss and the motion to substitute counsel. Adams informed the magistrate at that time that the only work he had done on the case was to visit Lewis once at Menard; he had not yet even reviewed the pleadings. He also stated that he had asked prison officials at Menard to allow him to tour the facility and interview witnesses but that they denied his request. Adams apologized for his lack of work on the case, explaining that his commitments to his paying clients did not allow him to spend much time on this case and that he did not think that he would have time for the indefinite future to devote to it. Adams also stated his belief that the prisoners deserved better representation than he was able to provide them. Statement of Proceedings at 2–3, *Lewis v. Lane,* No. 84–3113 (S.D.Ill. approved May 30, 1986) ("St. of Proc.").[3]

Despite Adams' obvious lack of enthusiasm to carry out his responsibilities to his clients, the magistrate denied the plaintiffs' motion to substitute counsel. The magistrate, however, did take steps to improve Adams' ability to represent his clients. He ordered prison administrators to provide Adams with adequate access to Menard's death row to interview his clients and potential witnesses. The magistrate informed Adams that he had been appointed to represent Erickson as well as Lewis (Adams had not realized that he represented both plaintiffs). In response to Adams' complaint regarding time pressures, the magistrate gave him 60 days to reply to the defendants' motion to dismiss, which the magistrate indicated would be treated as a summary judgment motion because it was accompanied by supporting affidavits. The magistrate also indicated that he would set the case for oral argument before ruling on the summary judgment motion. *Id.* at 3. Lewis and Erickson were not informed of the disposition of these two motions.

Adams failed to take any action on this case after the January 24 hearing. He did not conduct any discovery, tour death row, interview the plaintiffs or witnesses, conduct any legal research, file any document with the court or review the record on file at the courthouse. Adams' Dep. at 28, 54. He never even determined whether the claims had merit. *Id.* at 61. By his own estimate, he spent a total of ten to fifteen hours on the case from the date of his appointment until the summary judgment motion was granted; this estimate included travel time and court appearances. *Id.* at 63. Adams did not even realize that the magistrate had converted the motion to dismiss into a summary judgment motion; he believed that the magistrate had simply reset the hearing on the motion to dismiss. He also did not know that a motion to dismiss could be treated as a motion for summary judgment if it is filed with supporting affidavits. *Id.* at 51–52. He also claimed that even after the January hear-

---

**3.** A statement of proceedings of the January 24, 1985 hearing is included in the record on appeal in lieu of a transcript of that hearing because the electronic tape, which was the only record of the proceeding, could not be located in the district court.

ing he was not sure that he represented Erickson. *Id.* at 37. Adams did not receive a copy of the report of the January 24 hearing, and he apparently never attempted to obtain a copy. *Id.* at 51.

On May 29, 1985, the magistrate granted the defendants' summary judgment motion without oral argument. Adams did not file a motion to reconsider nor did he file a notice of appeal. Adams did not appeal because he "didn't intend to devote anymore [sic] time [to] the case or to be further involved with it if [the magistrate] had ruled on it." *Id.* at 60–61. Lewis indicated that he was going to file a notice of appeal, and Adams "was satisfied [that he] was finally out of it." *Id.* at 61. Lewis and Erickson, proceeding *pro se*, appealed the magistrate's denial of their motion for substitution of counsel as well as his order granting summary judgment.

## II.

Lewis and Erickson challenge the propriety of Adams' initial appointment as well as the denial of their motion to substitute counsel. The first question is easily disposed of; the second presents a more complex issue.

Appellants do not challenge the appointment of Adams on the ground that the court should have found him incompetent to provide representation in this case.[4] Rather, they argue that the initial appointment was invalid because Adams did not validly consent to it. This claim presents the question whether consent is a prerequisite to appointment under section 1915(d), and if it is, whether Adams' consent was invalid because he accepted the appointment only after the magistrate indicated that he might be disbarred from practice in the Southern District if he refused.

 Section 1915(d) provides that a court may "request" an attorney to represent an indigent plaintiff; the use of the word "request" rather than "appoint" suggests that the attorney's consent is required. Cases from this circuit, however, have not inter-

preted the term "request" consistently. *Compare Caruth v. Pinkney*, 683 F.2d 1044, 1049 (7th Cir.1982) (under "28 U.S.C. § 1915-a court has the authority only to *request* an attorney to represent an indigent, not to require him to do so") (emphasis in original), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 451 (1983) *with McKeever v. Israel*, 689 F.2d 1315, 1319 & n. 8 (7th Cir.1982) (Although the distinction between "requesting" and "appointing" was irrelevant in this case, the court noted that "the power of a court to provide counsel under section 1915(d) is commonly referred to as a power to 'appoint.'"). We need not choose a definitive definition of "request" in this case because even if consent is required before an appointment is valid under section 1915(d), Adams validly consented to accept the representation of the plaintiffs in this case.

When Adams received the magistrate's letter requesting that he represent the plaintiffs, he contacted the magistrate and related a variety of reasons why he did not want to take on this case, including his lack of experience in civil rights issues, a heavy case load and his lack of easy access to a library containing federal materials. Adams' Dep. at 23–25. The magistrate indicated that none of these reasons was compelling and that if Adams declined the case, his name would be submitted to the chief judge of the federal district for possible termination of his membership in the Southern District bar. Adams then indicated that he would take the case and would do what he could on it. *Id.* at 25.

Although Adams was a reluctant appointee, he did validly consent to represent the plaintiffs. After determining that counsel should be appointed to represent an indigent plaintiff under section 1915(d), a court is faced with the sometimes difficult task of securing *pro bono* representation. Although the bar has long recognized its professional duty to provide this type of

---

4. Adams has been a member of the Illinois bar since 1971. Although Adams primarily practices in the area of plaintiffs' personal injury law in state court, he had handled some cases in federal court at the time of his appointment to this case. Adams' Dep. at 21–22, 26, 70–71.

public service,[5] providing legal services without fee does entail hardship which some members of the bar are reluctant to accept. The Southern District of Illinois requires that members of the bar of that court "be available for appointment by the Court to represent or assist in the representation of those who cannot afford to hire an attorney." S.D.Ill.Local Rule 1(f) (effective Oct. 1, 1980); such appointments are limited to a maximum of one per any twelve-month period, *id.*, which minimizes the burden on attorneys. Reminding an attorney of the consequences of failing to abide by the rules of the district bar of which he is a member does not vitiate the validity of his subsequent consent to follow those rules.

### III.

■ A more difficult question is presented by appellants' claim that the magistrate erred in denying their motion to substitute counsel.[6] The question whether to permit a substitution of counsel rests within the sound discretion of the district court. *United States v. Morris*, 714 F.2d 669, 673 (7th Cir.1983); *United States v. Mills*, 597 F.2d 693, 700 (9th Cir.1979).[7] We conclude that the magistrate abused his discretion in denying the motion to substitute counsel.

When the magistrate ruled on the motion to substitute, he had before him the complaints raised by Lewis and Erickson in their motion as well as the explanations offered by Adams during the January 24 hearing. The plaintiffs complained that Adams failed to accept collect calls from Lewis,[8] did not visit Menard, never got in touch with Erickson and had not filed an amended complaint. At the hearing, Adams told the magistrate that he had done no work on the case except to visit

---

5. *See* Ethical Consideration 2–25 of the American Bar Association Code of Professional Responsibility: "The basic responsibility for providing legal services for those unable to pay ultimately rests upon the individual lawyer...." *Annotated Code of Professional Responsibility* at 97 (1979).

6. Appellants argued in their opening brief that civil litigants represented by counsel appointed under section 1915(d) have either a statutory or constitutional right to minimally effective assistance of counsel and that the magistrate denied Lewis and Erickson this right by refusing to allow the substitution of counsel. Appellants' Brief at 11. The appellants abandoned this argument in their reply brief. Appellants' Reply Brief at 9 & n.*. The principle that there is, in general, no constitutional or statutory right to effective assistance of counsel in civil cases is well established. *See Wolfolk v. Rivera*, 729 F.2d 1114, 1120 (7th Cir.1984); *Nicholson v. Rushen*, 767 F.2d 1426, 1427 (9th Cir.1985); *Allen v. Barnes Hosp.*, 721 F.2d 643, 644 (8th Cir.1983); *Watson v. Moss*, 619 F.2d 775, 776 (8th Cir.1980).

7. Both parties assume that the standard for reviewing a denial of a motion to substitute counsel is the very narrow one set forth in *Stewart v. General Motors Corp.*, 756 F.2d 1285, 1293 (7th Cir.1985): "The denial of the motion will not be reversed unless there existed a *demonstrable* conflict of interest or a total lack of communication between the attorney and the client." Although *Stewart* itself involved the denial of a substitution of counsel motion in a civil case, the "conflict of interest" or "total breakdown in communication" standard was originally developed in the context of reviewing the denial of substitution motions in criminal cases. *See, e.g., United States v. Morris*, 714 F.2d 669, 673 (7th Cir.1983); *United States v. Mills*, 597 F.2d 693, 700 (9th Cir.1979); *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir.1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1386, 35 L.Ed.2d 587 (1973). In criminal cases, the concern is that if the court denies a substitution motion in light of a substantial complaint about counsel involving, for example, conflict of interest or total lack of communication, the defendant may properly claim that his sixth amendment right to counsel has been denied. If a complaint does not rise to the level of presenting a sixth amendment problem, however, a trial court's refusal to allow a substitution of counsel is reviewed under the abuse of discretion standard. *Calabro*, 467 F.2d at 986. Thus, in criminal cases a trial court's refusal to allow the substitution of counsel may be reversed because it constitutes an abuse of discretion or because the conflict between attorney and client was so severe that the denial deprived defendant of his sixth amendment right to counsel. This bifurcated approach, however, has no application in the civil context because, as noted, a party in a civil case does not have a constitutional or statutory right to effective assistance of counsel. In reviewing the denial of a substitution of counsel motion in a civil case, therefore, we conclude that the appropriate standard is abuse of discretion.

8. Apparently, prisoners can only make collect calls, but Adams was not aware of this fact at the time he was representing the plaintiffs. Adams' Dep. at 40.

Lewis once at Menard. He also stated that he had not yet reviewed the pleadings and would need more time to file an amended complaint, but that he did not know when he would be able to find the time in the future to devote to this case. St. of Proc. at 2–3. He also informed the magistrate that the prison administrators were not cooperating with him and, consequently, that he was unable to interview either his clients or potential witnesses. Adams' Dep. at 48.

After hearing Adams' explanation, the magistrate denied the motion to substitute counsel but took steps to improve Adams' ability to represent his clients. The magistrate ordered the prison administrators to allow Adams access to Menard. He also gave Adams 60 days to respond to the defendants' summary judgment motion and, in fact, did not rule on the motion until four months after the January hearing. The magistrate also specifically informed Adams that he represented Erickson.

█ We appreciate the efforts of the magistrate to address the problems with which he was faced in January 1985, and if Adams had been a more zealous advocate, the court's orders would have been sufficient. It seems clear, however, that Adams' failure to prepare this case was due in large part to his lack of enthusiasm in fulfilling his duty to his clients. The prison administrators told Adams in October when he was visiting Lewis that his access to Menard would be restricted, yet Adams did not inform the magistrate of this obstacle until the January hearing. Eight months after his appointment, the only effort Adams had expended on the case was to visit Menard once for a one-half hour interview with Lewis, and apparently, he only visited Lewis then because he was in the area on another matter. *Id.* at 38. Although Adams claimed that he did not have time to work on this case, he never moved for an extension of time. *Id.* at 58. Especially in light of the extreme reluctance with which Adams took on this case, the magistrate should have realized that his order would not take care of the problems raised by plaintiffs if Adams continued to give their case a "low priority." *Id.* at 64.[9] The magistrate either should have granted the motion to substitute, or should have held a hearing or taken other appropriate steps to determine whether the problems raised in the motion to substitute had been cleared up, before ruling on the summary judgment motion. The magistrate indicated during the January hearing that he would schedule oral argument before ruling on the summary judgment motion, but he failed to do so. When the magistrate ruled on that motion, he was aware that no counter-affidavits had been filed, and in light of Adams' track record, he should have realized that Adams' failure to file affidavits was very likely due to the attorney's continued lack of diligence rather than a strategic decision. The magistrate's failure to grant the motion to substitute is especially perplexing in light of the fact that the plaintiffs indicated in their motion that another attorney was willing (and, apparently, is still willing, Appellants' Brief at 17 n.*) to take this case. In addition, replacing Adams in January would not have seriously delayed the litigation. The magistrate did not seem concerned with expediting this suit; he gave Adams 60 days to respond to the summary judgment motion and, in fact, delayed ruling on this motion for four months. Duplication of effort by substitute counsel was also not a factor counseling against replacing Adams given how little preparation Adams had done. Thus, we find that, under the circumstances of this case, the magistrate abused his discretion in denying the motion to substitute.

### IV.

We also vacate the magistrate's entry of summary judgment and remand with instructions that substitute counsel be given the opportunity to file counter-affidavits in

---

**9.** According to Adams, he indicated to the magistrate at the time of his appointment that he was not willing "to sacrifice services and time that [he]'d have to devote to [his] regular established clientele to serve in a civil indigent case," even one involving constitutional issues. Adams' Dep. at 66–67.

opposition to the defendants' summary judgment motion. A review of the *pro se* complaint and attached affidavits suggests that plaintiffs, with the assistance of counsel, may be able to raise genuine issues of material fact, making summary judgment inappropriate.

■ An allegation of inadequate heating may state an eighth amendment violation.[10] *See, e.g., Ramos v. Lamm,* 639 F.2d 559, 568 (10th Cir.1980) ("a state must provide ... reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (*i.e.,* hot and cold water, light, heat, plumbing)") (citations omitted), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1409 (N.D.Cal.1984) ("[i]t is clear that adequate heating and ventilation are fundamental attributes of 'shelter,' which is a basic Eighth Amendment concern") (footnote and citations omitted), *aff'd in part, rev'd in part,* 801 F.2d 1080 (9th Cir.1986). An assistant warden at Menard stated in an affidavit accompanying the state's motion to dismiss that the heat in the condemned unit was checked each time a complaint was made and that the temperature was always found to be within the range of 68 to 72 degrees. Affidavit of Michael W. Frazer at 1 (Oct. 19, 1984). By contrast, Lewis' affidavit, which accompanied the *pro se* complaint, claimed that the temperature at times fell to between 52 and 54 degrees. Affidavit of Cornelius Lewis at 2 (Jan. 3, 1984).

■ The plaintiffs may also be able to establish on remand a claim with respect to the bar-banging. We, of course, recognize that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v.* *Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). This deference, however, "does not insulate from review actions taken in bad faith and for no legitimate purpose." *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986). Thus, if the prison administrators used an otherwise legitimate security measure in a manner designed to harass prisoners, the eighth amendment might be implicated. An assistant warden at Menard claimed that the bar testing takes only 30 seconds or less per cell and, to the extent possible, is done while the prisoners are in the yard exercising. Frazer Affidavit at 2. The plaintiffs, on the other hand, suggest that the prison administrators have carried out this security measure in a manner designed to harass the prisoners on death row. Lewis Affidavit at 1.

## V.

We vacate the entry of summary judgment and remand for the appointment of substitute counsel. On remand, counsel should be given an opportunity to file affidavits opposing the defendants' summary judgment motion.

VACATED AND REMANDED.

CUMMINGS, Circuit Judge, concurring.

While I am in agreement with my brother Cudahy's opinion, it is clear that attorney Tom Adams so neglected his appointment duties that he should be reprimanded by Chief Judge Foreman, probably removed from the roll of attorneys of the court below, and referred to the appropriate disciplinary authority of the Illinois Supreme Court. His behavior, if unchecked, might prompt other appointed counsel to be indifferent to their duties under 28 U.S.C. § 1915.

---

10. Plaintiffs apparently do not claim that the physical discomfort that they allegedly suffered as a result of the low temperatures resulted in a separate eighth amendment claim. *Cf. Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("deliberate indifference to serious medical needs of prisoners" constitutes a violation of the eighth amendment). They do not attack the level of medical care provided them, only the fact that the lack of heat was severe enough to produce physical discomfort. The plaintiffs' own affidavits indicate that the prison administrators were not indifferent to their health problems.