UNITED STATES of America, Appellee,

v.

John Frank MANCINO, Appellant.

No. 72–1297.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 18, 1972.

Decided Nov. 16, 1972.

---

Ronald I. Meshbesher, Minneapolis, Minn., for appellant.

Joseph T. Walbran, Asst. U. S. Atty., Minneapolis, Minn., for appellee.

Before LARAMORE, United States Court of Claims Senior Judge and HEANEY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

This is an appeal from a judgment of conviction pursuant to a three-count indictment charging John Frank Mancino with: 1) aiding, counseling, procuring, inducing and causing, from November 27 to December 7, 1971, Bernard T. Malland to make two firearm silencers without having filed a written application with the Secretary of the Treasury or his delegate, in violation of 26 U.S.C. §§ 5861(f) and 5871; 2) aiding, counseling, inducing, procuring, and causing, on December 7, 1971, Bernard T. Malland, to transfer the silencers mentioned above without having paid a transfer tax in violation of 26 U.S.C. §§ 5861(e) and 5871; and, 3) conspiring between November 27 and December 7, 1971, with Bernard T. Malland and George Harding Bryant, and other unknown persons, to make and transfer the above-mentioned silencers in violation of 18 U.S.C. § 371. Mancino was convicted by a jury of all three counts. We affirm the judgment of conviction.

The principal issue on appeal is whether the trial court committed prejudicial error when it admitted into evidence testimony by government agents relating to certain out of court declarations made by another government agent-informer, which declarations were made outside the presence of Mancino; especially since the government agent-informer was not produced as a witness.

The Government's case revolved around an alleged conspiracy between Bryant, Malland, and Mancino. Mancino purportedly wanted to buy two silencers; Malland agreed to make them, and Bryant agreed to supply the pistols. Bryant was a government agent-informer who participated in the activities of the alleged conspiracy at the Government's direction. Thus, while there was a conspiracy between Malland and Mancino justifying the use of the co-conspirators' exception to the hearsay rule with regard to statements made by them, Mancino argues that Bryant was not a co-conspirator because as a government agent he lacked the requisite criminal intent; therefore, Mancino argues, out of court declarations by Bryant, made when Mancino was not present, and reported by government agents,[1] constitute impermissible hearsay evidence not cognizable under the co-conspirators' exception to the hearsay rule. Mancino points to the following testimony:

1. Flickinger testified that he overheard Bryant tell Malland that Mancino was looking for him.

2. Flickinger and Green testified that they heard Bryant say to Malland, "these are the guns that John Mancino wants the silencers fitted to."

3. Flickinger and Green testified that they heard Bryant speak to someone on the phone whom they thought was Malland. The substance of the conversation was that Mancino was waiting at Suzie's Bar.

4. Flickinger testified that he heard Bryant speak to someone on the phone he thought was Mancino. The substance of the conversation was that the silencers were ready and they would be at the 622 Club in an hour or so.

1. The government agents who testified were Flickinger, Green, and Foster.

**1352**

5. Flickinger and Foster testified that they heard Bryant tell Donna Peterson that Bryant had recently seen Mancino, that Mancino was angry because he heard the police were at the 622 Club, and thus, Mancino would not come to pick up the silencers.

6. Flickinger testified that Bryant told him that Mancino had earlier attempted to obtain silencers.

7. Malland testified that about a month before the time period relevant here that the subject of silencers had come up in a conversation with Bryant.

█ We have concluded that, even assuming that the testimony Mancino objects to was impermissible hearsay because Bryant was not a co-conspirator and because the questioned statements were made outside of Mancino's presence, a question we do not here decide, the admission of the questioned evidence was harmless beyond a reasonable doubt. *See generally* Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 21 (1972); Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 22–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966); Kotteakos v. United States, 328 U.S. 750, 763–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1945); United States v. Yow, 465 F.2d 1328 (8th Cir. 1972); Smith v. United States, 460 F.2d 1236, 1237 (8th Cir. 1972); Ricehill v. Brewer, 459 F.2d 537, 540 (8th Cir. 1972); Kaufman v. United States, 453 F.2d 798, 803–804 (8th Cir. 1971). A recent statement by the Supreme Court indicates that this Court must determine whether there is a "reasonable doubt that the jury at petitioner's . . . trial would have reached the same verdict without hearing [the tainted] testimony." Milton v. Wainwright, 407 U.S. 371, 377, 92 S.Ct. 2174, 2178 (1972). In making such a determination, this Court need not close its eyes to the reality of overwhelming evidence of guilt fairly established by use of evidence not challenged. *Id.* at 377–378, 92 S.Ct. 2174.

In this case, the Government sought to prove: that Mancino entered the 622 Club, a tavern, and met with Bernard "Red" Malland and George Bryant, a bartender at the 622 Club and also a government informer; that Mancino asked Malland to make two silencers; that Malland agreed, but found the pistol Mancino offered unsuitable for the purpose of mounting silencers; that Mancino then asked Bryant to procure two .22 automatic pistols for Malland and that Bryant agreed; that Mancino told Bryant to keep in touch with Malland and call Mancino when the silencers were ready and Mancino would then pick up the guns at the 622 Club; that during the next week Bryant gave two pistols to Malland who delivered the guns and the silencers to Mancino; that Mancino test fired them and the silencers did not work properly; that Malland left to repair the silencers, leaving the pistols with Bryant at the 622 Club; and that Malland repaired the silencers and delivered them to Bryant at the 622 Club.

The evidence which was used to prove these allegations and which is not at issue came primarily from the testimony of Flickinger and Malland. Flickinger testified that while working as an undercover agent for the United States Treasury Department, Alcohol, Tobacco, Tax and Firearms Division, he observed Mancino enter the 622 Club at about 12:00 noon on November 27, 1971. Flickinger observed Mancino speak with George Bryant, the bartender—an agent informer. Bryant said that Malland would be in the bar later that day and Mancino indicated that he would be back in about an hour and if Malland appeared, Mancino would meet with him. Later that day Mancino came back to the 622 Club and Bryant introduced Mancino to a man who was later identified as Malland. Mancino asked Malland if he could make silencers and Malland indicated that he could. Mancino then drew a pistol from his coat and asked

Malland if the gun could be fitted with a silencer. Malland indicated that the pistol was not suitable and Mancino asked Bryant if he could procure two .22 automatic pistols. Bryant indicated that he could. Mancino then said, "Fine you locate the pistols and supply them to Red." (Malland) Mancino then asked Malland how much the silencers would cost and Malland replied that the price was $150 each. Mancino objected saying, "I want a couple of cheapies or throwaway packages because they are going to be a little hot after this job. I don't want them found." He further stated, "$300 is a little high to pay for two silencers." At that point Malland stated that he would make the two silencers for $300, that he would keep in touch with Bryant, that when Bryant had the two .22 automatic pistols ready for delivery he would pick them up and have the silencers fitted to them. Malland then left. Mancino told Bryant to "pick up these two firearms, and keep in touch with Red. As soon as he gets the silencers fitted, let me know, and we can pick them up." Mancino indicated that he would pick up the silencers and the guns at the 622 Club.

On December 2, 1971, Flickinger and undercover agent Green observed Malland enter the 622 Club and saw Bryant give Malland what appeared to be two .22 automatic pistols.

On December 3, 1971, Flickinger and agent Green, observed Bryant on the telephone. Bryant said something and Flickinger and Green then went to a bar owned by Mancino. The agents observed Malland and another man leave Mancino's bar.

On December 5, 1971, Flickinger saw Malland speak to Bryant in the 622 Club. Malland told Bryant that he gave the guns with the silencers to Mancino and when Mancino test fired them the ends came off and Mancino was unhappy. Malland told Bryant that he would have the silencers in a day or so.

On December 7, 1971, in the 622 Club, Flickinger observed Malland hand Bryant what he thought to be two silencers.

Malland was also present at trial and testified against Mancino. His testimony is quite similar to that of Flickinger. Malland testified that on November 27, 1971, he met Mancino at the 622 Club, Mancino asked him to make two silencers and Malland agreed. However, Malland indicated that the gun Mancino wanted a silencer for was not suitable and Mancino asked Bryant to acquire suitable guns. Further, Malland testified that during the next week he picked up two guns from Bryant.

Malland testified that on December 2, 1971, he delivered the silenced guns to Mancino at Suzie's Bar. Malland said that Mancino test fired the pistols and the ends came off. Malland testified that Mancino asked him, "How would you like to use them on a job and have that happen to you?" Malland testified that thereafter he took the guns to Bryant but kept the silencers. Malland said that he repaired the silencers, delivered them to Bryant at the 622 Club and was arrested on his way to work.

First, with the foregoing in mind, it is evident that the amount and quality of "untainted" evidence pertaining to guilt was near overwhelming. Rarely can the Government prove that a conspiracy was entered into by means of a law enforcement agent's eye witness observation. Here agent Flickinger watched and heard the participants come together, discuss the specifics of the conspiracy in rather minute detail, and reach agreement. Specifically the agent saw and heard Mancino ask Malland to make silencers, ask Malland what the price would be and proclaim that the silencers would be "hot" after a "job". Flickinger saw and heard Malland agree to make the silencers. He heard that the guns to be silenced would be procured by Bryant and they would be .22 caliber automatic pistols. Moreover, not only was the agent able to observe the meeting where the agreement took place, but agent Flickinger and agent Green were able to watch the conspiracy unfold. As the agents sat in the 622 Club they watched Bryant give Malland what ap-

peared to be two .22 automatic pistols. Still further there is the testimony of Malland, the man who agreed to make the silencers, which is substantially the same as Flickinger's testimony relative to the first meeting and substantially the same as Flickinger's and Green's testimony about Bryant giving the pistols to Malland. Furthermore, Malland testified that he took the silenced guns to Mancino and Mancino test fired them. Thus, as the Supreme Court noted in Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), this case was "not woven from circumstantial evidence." The untainted evidence was direct evidence consisting of eye witness observations of government agents and, indeed, the focal point of the conspiracy, the man who made the silencers.

Second, mindful of the force of the direct evidence of guilt, it is helpful to turn now to an examination of the testimony which is allegedly tainted. The first statement objected to relates to Flickinger's testimony that he overheard Bryant tell Malland that Mancino was looking for Malland. This statement occurred on the day the first meeting between Malland and Mancino took place. The significance of the statement by itself seems miniscule, but, in any event, there was other competent evidence that Mancino had indicated to Bryant on the same day that if Malland came to the 622 Club he would meet with him. Thus this allegedly tainted evidence is merely cumulative.

The next statement which is the subject of objection relates to Flickinger's and Green's statements that they overheard Bryant say to Malland, "these are the guns John Mancino wants the silencers fitted to." This evidence relates to the meeting of Bryant and Malland where Bryant purportedly gave Malland the two .22 automatic pistols in the 622 Club. While this evidence explicitly ties Mancino to the guns, it adds nothing to the other competent testimony to the effect that Flickinger overheard Mancino tell Bryant to procure two .22 automatic pistols and give them to Malland,

which is exactly what happened according to the eye witness testimony of two government agents.

The third statement relates to the testimony of Green and Flickinger that they heard Bryant speak to someone on the phone whom they thought was Malland. The substance of the conversation was that Mancino was waiting at Suzie's Bar. The impact of this evidence is difficult to comprehend. Both agents saw Malland leave Mancino's bar. And more importantly, Malland testified that he indeed went to Mancino's bar, delivered the silenced guns, and witnessed Mancino test fire the pistols.

The fourth and fifth statements relate to the testimony of Flickinger that he overheard Bryant speak to someone on the phone whom he thought was Mancino. The substance of the conversation was that the silencers were ready and that they would be at the 622 Club in an hour or so. This statement must be analyzed together with the additional testimony of agents Flickinger and Foster that they heard Bryant tell Donna Peterson that Bryant had recently seen Mancino, that Mancino was angry because he heard the police were at the bar and, thus, Mancino would not come to pick up the silencers. This testimony is hardly of crucial importance because there was direct evidence that Mancino was connected with the silencers after the first meeting. It is noted that Malland testified that he took the silencers to Mancino and Mancino test fired them. Thus there was direct evidence that Mancino had come in contact with the illicit weapons and the objectionable testimony was not necessary to explain why Mancino did not pick up the guns at the 622 Club. The Government could prove, independent of the tainted testimony, that Mancino had directed the making of the silencers and had received and tested the product of the conspiracy.

Another statement relates to Flickinger's testimony that Bryant had told him that Mancino had earlier attempted to obtain silencers. This evidence was admitted solely to give the jury a back-

ground and not to prove the truth of the conversation.

However, assuming arguendo that this evidence was inadmissible, it was merely cumulative evidence of Mancino's proven specific intent to commit the crime charged. Mancino told Bryant he would meet with Malland if Malland came to the 622 Club. Malland did come and Mancino met with him, asked him to make silencers and stated that the silencers would be "hot" after a "job". This evidence, which is not challenged, demonstrated that Mancino had contemplated obtaining silencers before the first meeting and that he did so with a culpable state of mind. The evidence Mancino objects to tending to show that he had earlier manifested a desire to obtain silencers seems consistent with a logical inference which could be drawn from the untainted evidence and therefore may be classified as cumulative.

The last statement which is the subject of objection relates to Malland's testimony that Bryant had mentioned, about a month before the time period relevant here, that the subject of silencers had come up. A reading of this testimony indicates that it is confused and proves essentially nothing. Mancino's name was never mentioned in this regard and he therefore was not prejudiced thereby.

Although Mancino was not able to cross-examine Bryant, it cannot be said that the jury was without any information about Bryant's character. Mancino's counsel was able to elicit from Flickinger that Bryant had four or five felony convictions involving "dishonesty" and that Bryant had spent fifteen of the last twenty years in prison. Further, during cross-examination, Mancino's counsel was able to elicit from Flickinger the statement that Flickinger had told Bryant that he would try to intercede on Bryant's behalf with regard to "some authorities" if Bryant cooperated. Furthermore, Mancino's counsel in closing argument said:

"You can believe what you want. You can believe on one hand, men with no criminal records for years, not one or two convictions; and on the other hand, men with four convictions like Malland and Bryant with a long record."

While this type of inquiry into Bryant's character certainly cannot serve as a substitute for cross-examination, it does indicate that the jury was aware that Bryant had a past history of criminal behavior and that Bryant might have had some "deal" with the Government. This evidence lessens the impact of the testimony claimed to be tainted.

It is also noted that both Flickinger and Malland were available to be cross-examined and Mancino's counsel vigorously examined both men. Mancino's counsel cross-examined Malland and was able to determine that Malland had a lengthy prior criminal record and that the Government had indicated it would inform the Court and Malland's parole officer about his cooperation.

We have examined each of the other alleged errors and have found them to be without merit.

Judgment of conviction is affirmed.