UNITED STATES of America,
Appellee,

v.

Willie J. VAUGHN, Appellant.

No. 73–1225.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1973.

Decided Nov. 5, 1973.

Gerald M. Werksman, Chicago, Ill., for appellant.

Allen L. Donielson, U. S. Atty., Des Moines, Iowa, for appellee.

Before HEANEY, STEPHENSON and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

Willie J. Vaughn appeals his conviction for distribution of heroin in violation of Title 21 United States Code, Section 841. Only one issue was presented for review: whether appellant was prejudiced by the admission into evidence of testimony relating to recent similar crimes by other persons in the same area as the crime alleged in the indictment. We hold appellant was not unfairly prejudiced and affirm the judgment of conviction.

On August 20, 1972 agents of the Drug Abuse Law Enforcement Agency ("DALE") were conducting an investigation of narcotics activities in Des Moines, Iowa. At approximately 4:00 p. m., Detective Gene Crosby, a St. Louis police officer assigned to DALE, was given $225 in pre-recorded money. Crosby and an informant, Edward Mitchell, were then driven to 9th and Laurel Streets, where they walked to the corner of 11th and University, and then to a porch at 1208 11th Street, a short distance away. There they met Vaughn, who Crosby testified had previously agreed to sell him a spoon of heroin. Crosby testified that he received 17 capsules for which he paid Vaughn the $225 which he was carrying on his person. The capsules were later determined to contain heroin. The defendant was arrested on October 13th.

The testimony of Agent Crosby was re-enforced by that of Special Agent Dennis Harker, who observed the transaction take place by using binoculars from a half block away. Other eye witnesses to the encounter who testified were Agents Sam Lee Lackland, Calvin Culp and Kenneth Bloemker.

Vaughn testified that on August 20th he was at an outdoor cookout at a residence on 11th Street from 11:00 a. m. to 10:00 p. m., leaving only once at 1:00 to pick up his children and bring them back to the cookout. He produced five witnesses who had attended the cookout to substantiate his alibi. The cookout took place at 1222 11th Street, some four or five houses from 1208 11th Street, where the transaction occurred.

During the cross-examination of Agent Crosby, defense counsel vigorously challenged the probability of Crosby's testimony that the narcotics sale had taken place in daylight on the street.[1]

---

1. "Q Before that hour, had you met him prior to that?
A No, sir.
Q You had never had any dealings with him?
A No, sir.
Q And as a matter of fact he was a stranger to you, wasn't he?
A Yes, sir.
Q This was on a Sunday afternoon, wasn't it?
A Yes, sir.
Q And it was a bright day here in Des Moines, wasn't it?
A Yes, sir.
Q And you want the jury and the Court to understand that the incident took place on the porch of a premises, is that right?
A Yes, sir.
Q Was this about 5 o'clock, p. m.?

A Yes, sir.
Q And many people were thereabouts, is that right?
A No.
Q How many people did you see in that area?
A Just a few, besides—maybe two or three others.
Q Two or three people were in the vicinity when the sale took place?
A When you said in the area, the three of us was the onliest ones on the porch at this time.
Q The three of you on the porch?
A Yes.
Q Did you see other people coming and going on this Sunday afternoon?
A Yes, sir, I seen people going in the same place that I were.
Q Where you were, on the porch?

On redirect examination, government counsel elicited testimony, over objection, that Crosby had observed numerous narcotic transactions in the area, none of which involved Vaughn.

"By Mr. Uhl:

Q. Mr. Crosby, the porch where the transaction occurred, do you know that particular address?

A. 1208—11th Street.

\* \* \* \* \* \*

Q. And you stated that the house where the buy took place belongs to Mr. Carter, is that correct?

A. Yes, sir.

Q. And what's the basis of your knowledge of Mr. Carter?

A. I made a purchase, two purchases on the inside of Mr. Carter's house.

Q. What kind of purchases?

A Yes, sir.
Q And were they going in or coming out?
A In and out.
Q How long did you talk to the defendant as you had this illegal narcotic transaction?
A Just a matter of minutes.
Q How many minutes would you say?
A Oh, two or three, maybe four.
Q And you counted the money out to him?
A Yes, sir.
Q And this was in open view.
A Yes, sir.
Q And then he gave you a package?
A Well, he gave me the package and I gave him money.
Q And you opened the package to see what was in it?
A Yes, sir.
Q And you saw that it was for certain 17 caps of narcotics, is that right?
\* \* \* \* \* ⸴
Q Now, is it true, Mr. Crosby, that when people are selling illegal narcotics, as a general rule that it's done in a secret place, isn't that true?
A Sometimes.
Q But in general, isn't it true?
A In general, yes, sir.
Q Isn't it true that in general, that in narcotics dealings, that a sale is not made in the open or plain public view; isn't that true, sir?
A On the corner of 11th and University is the exception, sir.
MR. STARKE: I move that that be stricken.

A. Heroin.

Q. Now, on cross-examination you were asked some questions about what generally happens. I'd like to ask about what specifically happens up around 11th and University? Have you ever bought any other heroin out in the open around 11th and University?

A. Yes, sir.

Q. About how many times?

A. About four or five times.

Q. And have you ever counted out money in the open to pay for this heroin around 11th and University?

A. Yes, sir.

Q. How many times has that happened?

A. Three times, sir.

Q. About how many buys have you made up in the area of 11th and University?

Q In general, though, isn't it true that it is done behind closed doors? Isn't that true, sir?
A Sometimes, yes, sir.
Q But isn't it true, generally?
A I suppose you can say that. I would say—use the terminology "sometimes."
Q Isn't it true, or would it be fair to say that in general it is done where no other person is in view, and specifically the general public?
A Yes, sir.
Q And isn't it true that a washroom or in the alley or a place of that kind would be the general place where a narcotic transaction would take place? That is true, isn't it, sir?
A A place where the light wouldn't be, sir.
Q Generally, isn't it true that night time is a more preferable contact for narcotics than in the day time? Isn't that true?
A I haven't experienced that. Most of my dealings was done during the day.
Q In plain view, is that right? Is that the impression you want to give the Court and the jury?
A Most of the time it was not in plain view. Sometimes in plain view. But the time up on the corner of 11th and University was in plain view.
Q And the money was counted in plain view?
A Yes, sir.
Q You are sure of that?
A I'm positive."

Mr. Starke: Object to that. It is not material to the issue. Improper redirect.[2]

The Court: I'm going to sustain that objection.

Q. About how many times, if ever, have you seen heroin and other controlled substances out in the open around 11th and University?

Mr. Starke: Objection.

The Court: Overruled.

A. I've seen transactions numbers of times at the vicinity of the corner of 11th and University.

Q. About how many transactions would you say in a day?

A. Oh, about——

Mr. Starke: Objection. No foundation as to time, place.

The Court: I think it's proper redirect.

Q. About how many heroin or controlled substance transactions would you see in a day around 11th and University?

A. Approximately twelve or fifteen a day.

Q. How many of those would occur out in the open?

A. Well, all of these I've seen out in the open."

Upon recross-examination defense counsel developed from Crosby that he observed from a distance numerous daylight transactions in the neighborhood which followed the same pattern—a package exchanged for money. He assumed, but could not state positively that the exchanges involved narcotics. Crosby also testified on recross-examination that he had made previous pur-

chases of narcotics in front of the same porch, but that his purchase from Vaughn was the first purchase on the porch.

Appellant contends that this testimony constituted evidence of other crimes, that it was not introduced under any of the exceptions to the rule against admitting such evidence, and that it weighed the balance unfairly against the appellant.[3] None of the challenged testimony purported to connect appellant to any of the "other" criminal activity. Indeed, had it done so, and even had it been offered under one of the well-recognized exceptions permitting such testimony for limited purposes, such as to show knowledge, intent or a common plan or scheme, we would be compelled to reverse the conviction as prejudicial because much of the evidence of such "other crimes" was neither plain, clear, nor conclusive. United States v. Broadway, 477 F.2d 991 (5th Cir. 1973); United States v. Spica, 413 F.2d 129, 131 (8th Cir. 1969).

■■ In this case, however, the evidence was introduced to meet the defense counsel's attack on the likelihood or probability that the exchange took place in daylight and in plain view in the area described and in the manner testified to by Crosby. When an issue has been opened up by such searching cross-examination, it cannot be said to be overreaching simply because the prosecutor seeks by redirect examination to clarify the point raised by means of other facts known to the same witness which might not have been admissible on the case in chief, absent such cross-examination. Under similar circumstances, we recently held that questions

---

2. Defense counsel's delay in making his objection may additionally be deemed a waiver in the absence of plain error. See McCormick on Evidence (1972) § 52.

3. Citing United States v. Brown, 453 F.2d 101, 108 (8th Cir. 1971), cert. denied, 405 U.S. 978, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972); United States v. Leach, 429 F.2d 956, 960 (8th Cir.), cert. denied, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 151 (1970);

United States v. Lewis, 423 F.2d 457, 459 (8th Cir.), cert. denied, 400 U.S. 905, 91 S.Ct. 146, 27 L.Ed.2d 142 (1970); Drews v. State of Minnesota, 407 F.2d 1307, 1308–1309 (8th Cir. 1969); Love v. United States, 386 F.2d 260, 266 (8th Cir. 1967), cert. denied, 390 U.S. 985, 88 S.Ct. 1111, 19 L.Ed. 2d 1286 (1968); Johnson v. United States, 356 F.2d 680, 684 (8th Cir.), cert. denied, 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed.2d 84 (1966).

dealing with a DALE officer's knowledge of the area and habits of narcotics dealers in leaving narcotics outside their control were within the permissible scope of redirect examination where defense counsel had cross-examined the witness on such matters in an attempt to impair the credibility of his testimony. United States v. Brown, 482 F. 2d 1226, 1228 (8th Cir. 1973). In United States v. Walker, 421 F.2d 1298 (3rd Cir.), cert. denied, 399 U. S. 931, 90 S.Ct. 2261, 26 L.Ed.2d 799 (1970), defense counsel asked a government agent on cross-examination whether he knew of any other sales at the place where the alleged narcotics violation took place. The agent said yes. The court held it was not error for the trial court to permit the government to develop the facts which defense counsel had opened up. Accord: Reece v. United States, 131 F.2d 186, 188 (5th Cir. 1942), cert. denied, 318 U.S. 759, 63 S. Ct. 529, 87 L.Ed. 1132 (1943); Kowalchuk v. United States, 176 F.2d 873 (6th Cir. 1949) (citing Cook v. United States, 28 F.2d 730 (8th Cir. 1928)).

In this case, there was even more reason to develop the point because the jury might well have concluded a daylight sale was so improbable as to discredit the agents' testimony.

This was an unusually strong case. The jury, of course, had to select between the defendant's testimony that he was somewhere else and the government's testimony that the defendant sold the heroin to a government agent in full view of four other agents. There was conflict in testimony between defense and government witnesses as to the color of defendant's clothing. Even defense witnesses, however, place the defendant in a house just a few doors from where the transaction took place. The jury chose to believe the testimony of the government agents. It is not often that so many government witnesses are available to confirm a narcotics sale. The evidence of guilt was overwhelming.

 Even though evidence of criminal activity may be admissible to clari-fy an issue opened up by the defense on cross-examination, we must satisfy ourselves that the court did not abuse its discretion by permitting such extensive evidence of activity outside the scope of the indictment that the risk of "birds of a feather" inferences by the jury outweighed the probative value for which such evidence was offered. United States v. Crawford, 438 F.2d 441 (8th Cir. 1971). In this respect, we see no significant difference between evidence of other crimes by the defendant and, as here, evidence of crimes by others than the defendant. It is a general rule applicable to all cases that the scope of examination of witnesses lies within the sound discretion of the trial court and reversal is warranted only when an abuse of discretion leads to prejudice. *See* United States v. Hiken, 458 F.2d 24, 26 (8th Cir.), cert. denied, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 81 (1972). Our examination of the whole record, and in particular the cross-examination, redirect examination and recross-examination of Agent Crosby convinces us that the prosecution did not exceed proper bounds in this case and that the court's refusal to exclude the challenged testimony was not error. To the extent others might apply a more severe standard of admissibility, we would nonetheless hold this to be harmless error in view of the overwhelming evidence of appellant's guilt and the absence of any testimony tending to besmirch appellant's character by linking him to the other crimes. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); United States v. Mancino, 468 F.2d 1350 (8th Cir. 1972).

Affirmed.

HEANEY, Circuit Judge (dissenting).

I respectfully dissent.

A careful reading of the record reveals that the defendant's counsel did not cross-examine Crosby with respect to whether Crosby had observed other open sales of narcotics in the vicinity of 1208 11th Street. The cross-examina-

tion was directed solely to the question of whether narcotics sales generally took place in the open and in broad daylight. Had the redirect examination been similarly pointed, the defendant could not be heard to complain. Rather, it was intended to show that twelve to fifteen sales per day of narcotics had been observed in the open in the same neighborhood as defendant's alleged sale. This testimony was such as to permit the jury to draw the inference that the defendant was a member of a narcotics ring engaged in the open selling of narcotics in the neighborhood. To avoid having this inference drawn by the jury, the defendant would have had to assume the burden of disproving that such sales had in fact been made. This would have been a hopeless task, particularly in view of the fact that the trial court did not require the prosecution either to lay a foundation as to the time of the sales or to identify the participants in the sales.

The prejudicial nature of this testimony is at least as apparent as that condemned by the Supreme Court in Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), by this Court in United States v. Crawford, 438 F.2d 441 (8th Cir. 1971), and by the Ninth Circuit in United States v. Conrad, 448 F.2d 271 (9th Cir. 1971). The trial court clearly abused its discretion in receiving it.

In light of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), I cannot accept the majority's view that the error in admitting the evidence was harmless. There, the Supreme Court stated:

"'If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that

substantial rights were not affected. . . .'"

*Id.* at 764, 66 S.Ct. at 1248.

The majority bolsters its view that the trial judge did not err in allowing the testimony by asserting:

"In this case, there was even more reason to develop the point because the jury might well have concluded a daylight sale was so improbable as to discredit the agents' testimony."

The above statement is inconsistent with the majority's finding of harmless error. Indeed, I read the statement to logically preclude such a finding.

The testimony of Agent Crosby not only created the impression that the defendant was a member of a narcotics ring operating openly in the neighborhood of 11th and University, but also tended to weaken his credibility and that of his alibi witnesses who frequented the same neighborhood. This was fatal, as the defendant's only chance of gaining an acquittal was to convince the jury that he and his witnesses were telling the truth.