**Alsansa X. CARUTH, Plaintiff-Appellant,**

v.

**Thaddeus E. PINKNEY, Warden, David Sandahl, Assistant Warden, and William O'Sullivan, Assistant Warden, Defendants-Appellees.**

**No. 79–2166.**

United States Court of Appeals, Seventh Circuit.

Argued May 21, 1982.

Decided July 13, 1982.

Rehearing and Rehearing En Banc Denied Sept. 8, 1982.

Michael B. Nash, P. C., Chicago, Ill., for plaintiff-appellant.

Katheryn Spaulding, Legal Counsel, Dept. of Corrections, Chicago, Ill., for defendants-appellees.

Before PELL, WOOD and COFFEY, Circuit Judges.

PER CURIAM.

Plaintiff Alsansa Caruth, an inmate at the Pontiac Correctional Center, commenced a *pro se* action under 42 U.S.C. § 1983 against various prison officials, alleging that the prison authorities violated his constitutional rights in disciplining him and taking away his job as a law clerk at the prison library. After a bench trial, the district court entered judgment for the defendants. Caruth appeals from this judgment. We affirm.

I.

Alsansa Caruth alleged in his complaint that in December of 1976 a fellow prison inmate gave him an application for membership in the Ku Klux Klan, telling him that such applications were being distributed to white guards and inmates at the prison as part of a Klan membership recruitment drive. At that time, Caruth, who is black, was a clerk in the prison law library and had access to the library photocopy machine. To photocopy material, Caruth was required to obtain the authorization of the prison librarian, George Toussaint.[1] Because Caruth feared that Toussaint would either deny him permission to photocopy the Klan membership application or confiscate it, Caruth surreptitiously enclosed the Klan application in a stack of legal documents which were to be photocopied. He then received permission to photocopy the papers as a part of his job. Caruth mailed copies of the Klan application to several newspapers and organizations, as well as to state corrections officials in Springfield, Illinois.

After Caruth mailed these copies, state prison authorities initiated an investigation into Klan activities at the prison. An "investigator from Springfield" (who is not further identified) and the prison's Internal Affairs Officer, Lt. Polizzi, met with Caruth on January 10, 1977, in connection with the investigation. At the interview, Caruth admitted making the copies. He heard no more about the matter until two months later when, on March 10, 1977, he was called to a meeting with Assistant Warden O'Sullivan, Lt. Polizzi, and the unidentified investigator from Springfield. Caruth again admitted that he had copied and mailed the Klan applications, but he refused to reveal the name of the inmate who gave him the original application. Two days later, Caruth was disciplined for the unauthorized use of the photocopy ma-

---

1. Toussaint testified at trial that it was his responsibility to supervise the use of the prison photocopy machine and to write up disciplinary reports for infractions relating to its use. He stated that the unwritten prison policy was that all photocopying was to be limited to materials relating to legal and grievance proceedings and educational assistance programs. The photocopy service was provided free of charge to the inmates.

chine and sentenced to serve 30 days in segregation. He was also dismissed from his job as law clerk.

On the basis of these allegations, Caruth contended in his complaint that he was disciplined for informing outsiders about Klan activity within the prison and that the charge of unauthorized use of the photocopy machine was nothing more than a mere pretext. Caruth also contended that he was being punished in violation of a prison regulation requiring charges to be brought within 72 hours of the discovery of the offense. Specifically, Caruth claimed that prison officials knew of his unauthorized use of the photocopy machine on January 10, 1977 and that he was not punished until March 12, 1977, after the State investigation had concluded. As relief, Caruth requested a "full and fair hearing" and reinstatement to his job as law clerk at the library.

Before the defendants filed an answer to the complaint, Caruth filed a supplemental complaint. After reiterating his charge that he was disciplined for bringing about an investigation on Klan recruitment activities at the prison, Caruth alleged that prison officials had initiated another pretextual charge against him, namely, that he had engaged in homosexual activity with another inmate. Caruth further alleged that in yet another example of "institutional retaliation" directed against him for the Klan investigation, prison authorities arbitrarily confiscated 15 encyclopedias and a law dictionary from him. Finally, he charged that he had not received adequate medical care for his ulcerated stomach. Caruth requested, in addition to the previously requested relief, damages for lost wages and for pain and suffering, and reinstatement of good-time benefits that had been taken from him. Caruth also requested counsel be appointed pursuant to 28 U.S.C. § 1915(d). This request was denied by the court.[2]

■ Trial was held on September 25, 1979. Caruth testified in his own behalf and introduced into evidence a prison pass showing that he had been interviewed by Lt. Polizzi on January 10, 1977 and the Ku Klux Klan application that he had photocopied. The defendants' only witness was the librarian Toussaint. In rebuttal, Caruth called Assistant Warden Sandahl. At the close of the evidence, the district court ruled that Caruth had not been punished in retaliation for initiating a state investigation on Klan activities in the prison but was in reality punished for the unlawful use of the photocopy machine.[3]

After the court announced its verdict, Caruth asked the court why Lt. Polizzi had not been called to testify, stating that Polizzi could "decide the whole thing." Defense counsel explained that, although Lt. Polizzi was named in the final pretrial order as one of defendants' potential witnesses, he was unavailable for the trial because of a death in his family. The court agreed, adding that in any event, "there is no requirement that any party call all the witnesses that they think they might call."

Caruth now appeals the district court's judgment, asserting numerous grounds for relief. Among other things, he claims that the refusal of the district court to appoint counsel was an abuse of discretion; that the district court erred in failing to consider whether the disciplinary action against Caruth violated his first amendment rights to free speech and to seek redress of grievances; that the court's failure to call Polizzi as a witness was error; and that the court erred in failing to consider whether Caruth was punished in violation of the prison regulation requiring charges to be brought

---

2. Caruth appealed the denial of appointed counsel to this court. The appeal was dismissed for lack of jurisdiction on the ground that denial of a motion for appointment of counsel under 28 U.S.C. § 1915(d) is not an appealable order. *Caruth v. Pinkney*, No. 77–1816 (April 10, 1979) (unpublished order). The case proceeded, with Caruth acting *pro se*.

3. Among his many claims on appeal, Caruth reiterates his contention that he was punished in retaliation for bringing about an investigation on Klan activities at the prison. We find this claim to be unsupported by the evidence which was presented at trial. There is nothing to suggest that the district court's conclusion is erroneous.

within 72 hours of the discovery of the offense.[4]

## II.

The first issue we will address is Caruth's claim that the district court should have appointed counsel to represent him. The following principles provide the framework for our analysis.

There is little doubt that there is no constitutional right to appointed counsel in a civil case. *Randall v. Wyrick*, 642 F.2d 304, 307 n.6 (8th Cir. 1981); *Aldabe v. Aldabe*, 616 F.2d 1089, 1093 (9th Cir. 1980); *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *Thomas v. Pate*, 493 F.2d 151, 157 (7th Cir.), *cert. denied*, 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974); *Ehrlich v. Van Epps*, 428 F.2d 363, 364 (7th Cir. 1970). Federal courts, however, are empowered by statute to appoint counsel, when circumstances justify it. Section 1915 of Title 28 of the United States Code authorizes a court to request an attorney to represent a party in a civil action who is proceeding *in forma pauperis*.[5] The decision to appoint counsel for a civil rights litigant rests with the discretion of the trial court. *McBride v. Soos*, 594 F.2d 610, 613 (7th Cir. 1979); *Heidelberg v. Hammer*, 577 F.2d 429, 431 (7th Cir. 1978). Only when the denial of counsel results in "fundamental unfairness impinging on due process rights" will a denial of counsel be overturned. *La Clair v. United States*, 374 F.2d 486, 489 (7th Cir. 1967).

This Court has made it clear, however, that a court's discretion is to be guided by a consideration of all the circumstances of the case and particular emphasis is to be placed upon "certain factors" that have been rec-ognized as highly relevant to a request for counsel. *Maclin v. Freake*, 650 F.2d 885, 887 (7th Cir. 1981).

Foremost among the "certain factors" that an appointing court must consider is an analysis of the merits of the indigent litigant's claim from both a factual and legal standpoint. *Maclin* makes clear that a court need not appoint counsel when it considers the indigent's chances of success to be extremely slim. *Id.* at 887. In addition to the merits of a case, a court may consider any of a number of factors. Among these factors are the complexity of the legal issues presented and the capability of the litigant to recognize and present the issues, the complexity and conflicting nature of the facts, the ability of the litigant to investigate his case, and the relative substantive value of the claims presented. Because each case is unique, a decision to appoint counsel can be made only after the proper legal principles have been applied to the facts presented in each case.

In the immediate case, the district court gave four reasons when it denied Caruth's motion for appointment of counsel:

1. No source of compensation is known for appointed lawyers in civil cases.

2. It is unreasonable to require a lawyer to prosecute a civil case without compensation.

3. Many charitable and civic organizations, such as American Civil Liberties Union, Legal Aid Societies, etc., will provide counsel in civil rights cases which they consider meritorious.

4. Private lawyers often accept cases, which they evaluate as having recovery potential, on a contingent fee basis.

---

**4.** Caruth also asserts that he should have been allowed to appear at the final pretrial conference, that he should have been given a jury trial, that he was unfairly denied discovery, and that the district judge was biased against him and should have recused himself. We find that these contentions are all without merit.

**5.** 28 U.S.C. § 1915 provides in pertinent part:

(a) Any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees and costs or security therefor, by a person who makes affidavit that he is unable to pay such costs or give security therefor.

\* \* \* \* \* \*

(d) The court may request an attorney to represent any such person unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious.

These justifications do not comport strictly with the analysis required by *Maclin.* The generality of the reasons could apply in any civil case where appointment of counsel has been requested and they seem to indicate that counsel should never be appointed.

The analysis of the district court fails to take into account several factors intrinsically related to the appointment of counsel. First, the court's initial reason for denying appointment of counsel (no source of compensation is known for appointed lawyers in civil cases) fails to take into account the fact that appointed counsel may apply for attorney's fees under 42 U.S.C. § 1988 if they substantially prevail on the merits. The court's second reason (it is unreasonable to require a lawyer to prosecute a civil case without compensation) misconstrued the nature of 28 U.S.C. § 1915—a court has the authority only to *request* an attorney to represent an indigent, not to require him to do so. In any event, the district court has failed to take into account the recognized ethical responsibilities of each lawyer engaged in the practice of law to provide public interest legal services without fee.[6] There has been increasing consideration given to the social responsibility of lawyers to provide *pro bono publico* legal services. In 1975 the American Bar Association House of Delegates explicitly reaffirmed the professional obligation of each lawyer to provide public interest services and there currently exists serious discussion on mandating a minimum service as part of the proposed Rules of Professional Conduct. *Ray v. Robinson,* 640 F.2d 474, 478–79 (3d Cir. 1981). *See also Scott v. Plante,* 532 F.2d 939, 949–50 (3d Cir. 1976); *Peterson v. Nadler,* 452 F.2d 754, 758 (8th Cir. 1971). *Accord, Powell v. Alabama,* 287 U.S. 45, 73,

53 S.Ct. 55, 65, 77 L.Ed. 158 (1932) ("Attorneys are officers of the Court, and are bound to render services when required by such an appointment."). Although one proposal requiring mandatory *pro bono publico* work by attorneys was recently voted down by the American Bar Association, the very proposal itself indicates the awareness of the bar of its obligation to protect the rights of indigent litigants. *See* Rule 8.1, ABA Model Rules of Professional Conduct, Discussion Draft (1980). The bar within this Circuit has long viewed appointments of counsel as part of its professional duty to provide public service. We have faith that lawyers always will be found who are willing to represent the indigent without remuneration. Although we are not unsympathetic with the burden a district court faces in attempting to secure *pro bono* counsel, we merely note that the existence of this burden will not excuse a court from attempting to see that counsel is appointed in appropriate cases. We further noted that by appointing counsel in appropriate cases, a district court not only insures that the meritorious claims of a *pro se* plaintiff are not defeated, but also eases the burdens placed both on the district court and on this court when a skilled attorney presents a case. *See Stringer v. Rowe,* 616 F.2d 993, 1001 (7th Cir. 1980).[7]

In sum, a request for appointment of counsel should not be denied solely for the reason that an attorney who takes the case may not be compensated for his efforts. *Pro bono publico* work by attorneys is an established tradition and it is up to the district courts to tap the reservoir of talent that exists within this Circuit. When justifying a decision on appointment, a district

---

**6.** Ethical Consideration 2–25 of the American Bar Association Code of Professional Responsibility states that "The basic responsibility for providing legal services for those unable to pay ultimately rests upon the individual lawyer. . . . Every lawyer, regardless of professional prominence or professional workload, should find time to participate in serving the disadvantaged." EC 8–9 states that "the advancement of our legal system is of vital importance in maintaining the rule of law . . . [and] lawyers should encourage, and should aid in making,

needed changes and improvements." EC 8–3 states that "Those persons unable to pay for legal services should be provided needed services."

**7.** The district court's final two reasons essentially concern the diligence of the indigent in seeking private counsel. There is, however, no indication that the district court made any inquiry into Caruth's efforts or capability to solicit private counsel.

court must apply the *Maclin* standards to the facts of each case and *if* counsel is both warranted and available, the court should *request* representation. Nonetheless, reviewing the record of this case under the dictates of *Maclin*, we cannot conclude that denying Caruth appointment of counsel was improper. As noted, of primary importance in an indigent's request for counsel is an evaluation of the factual and legal merits of the claim and its chances for success. Caruth admitted in his complaint that he did *not* receive the required permission to photocopy the Klan application. This factual admission corresponds exactly with the reason given to Caruth by prison authorities for this punishment. It is also clear, as evidenced by Caruth's pleadings, that he was able to comprehend and adequately present his charge of pretextual punishment. *Cf. McBride v. Soos, supra*, 594 F.2d at 613 (this court refused to require the appointment of counsel where the issue was whether state officials have abused the extradition power by non-compliance with applicable state and federal law; surely as complex an issue as Caruth presented in this case). Caruth had access to the prison library in order to research the issues presented, and as a prison law clerk had at minimum a basic understanding of the judicial process. In short, the facts and issues alleged by Caruth were not of such complexity, controversy or merit to entitle him to appointed counsel. The district court's ruling on this issue must not be disturbed.

### III.

The second issue we must address is whether the district court erred when it neither decided nor recognized the issue of the constitutionality of the prison photocopy policy and whether the disciplinary action taken against Caruth violated his first amendment rights. In effect, the appellant argues on appeal that because of his *pro se* status, the district court should have recognized the first amendment issues lurking within the confines of his pleadings and dealt with them accordingly. We conclude, however, that while a district court has the obligation to insure that a *pro se* litigant is given fair and meaningful consideration of all claims presented (and it is clear that liberal construction is to be given to a *pro se* plaintiff's pleadings), the duty of the district court in this case did not extend so far as *to require* the court to bring to the attention of the *pro se* litigant or to decide the *unraised* issues which were subsidiary to the claims actually presented.

It is clear that a trial court has special obligations with respect to a *pro se* litigant. This heightened judicial solicitude is justified in light of the difficulties of the *pro se* litigant in mastering the procedural and substantive requirements of the legal structure. *See Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Hayes v. Walker*, 555 F.2d 625, 628 (7th Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977). As this Court made clear in *Madyun v. Thompson*, 657 F.2d 868 (7th Cir. 1981), the role of the district court should be to insure that the claims of a *pro se* litigant are given "fair and meaningful consideration." *Id.* at 876. Accordingly, a trial court is obligated to give liberal construction to a *pro se* plaintiff's pleadings. *Haines v. Kerner, supra.* Trial courts have also been held obligated to inform *pro se* plaintiffs of their right to file affidavits and other responsive material when their adversaries move for summary judgment against them. *Madyun v. Thompson, supra*, 657 F.2d at 876–77; *Muhammad v. Rowe*, 638 F.2d 693, 695–96 (7th Cir. 1981); *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979); *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975); *Hudson v. Hardy*, 412 F.2d 1091, 1094 (D.C.Cir.1968). But just how far a trial court should be required—or permitted—to go in any given case in assisting a *pro se* litigant is unclear and undecided. Accordingly, the ultimate determination of whether a *pro se* litigant has received a fair and meaningful consideration of his claims must be made on a case-by-case basis.

Although first amendment considerations are implicit in this case, and have been

directly argued on appeal by Caruth's court-appointed appellate counsel, the crux of the plaintiff's allegations is that he was punished in retaliation for bringing about an investigation on Ku Klux Klan activities at Pontiac Prison. In response, prison authorities maintain that Caruth was punished simply because he failed to receive the necessary permission to use the prison copying machine. The district court successfully captured the essence of Caruth's case in the pretrial order which phrased the issue to be resolved as "whether the plaintiff was actually disciplined in retaliation for embarrassment he caused prison officials by informing the news media that prison guards were distributing Ku Klux Klan applications to other guards and inmates" or whether "he was disciplined for his failure to obey prison rules." After a trial in which testimony was presented by both sides, the district court concluded that Caruth was being punished for violating prison regulations, not in retaliation for the Ku Klux Klan investigation. The record supports that which was apparent to the trial court; namely, the plaintiff simply hadn't met his burden of proof on the claim presented. From an academic statement, there are indeed first amendment issues potentially involved in this case.[8] Caruth's argument, however, concerns pretextual punishment and not whether the photocopying policy at Pontiac Prison violated the first amendment. We thus cannot conclude that the district court erred in not raising the first amendment issues now being raised on appeal in this case. It is readily apparent that Caruth was given fair and meaningful consideration of the issues that he raised in his case.

## IV.

Caruth's next contention is that the trial court erred when it refused to allow him to call a witness to testify after the court had announced its decision in this case. Caruth maintains that the testimony of the witness, Lt. Polizzi, was crucial to his case and that the court's refusal to allow Polizzi to testify violated Caruth's constitutional right to due process, compulsory process and confrontation of witnesses.

In reviewing this claim, it is important to note the role that a judge plays in our system of justice. A judge acts not as a mere moderator, but as the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities inherent in the adversary process. *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976). The judge's control over the proceedings must necessarily be substantial. *Id.* In the final analysis, the admissibility and the scope of examination of witnesses must be determined by the trial court in the exercise of its discretion. *See, e.g., United States v. Quinn*, 543 F.2d 640, 651 (8th Cir. 1976); *United States v. Vaughn*, 486 F.2d 1318, 1322 (8th Cir. 1973); *Curtis Publishing Company v. Butts*, 351 F.2d 702, 715 (5th Cir. 1965), *aff'd*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Applying these principles to the case at hand, it cannot be said that the trial court abused its discretion by refusing to reopen the proceedings to permit Caruth to call Polizzi to testify.

The record reveals that Caruth never requested that Polizzi be subpoenaed, nor did Caruth attempt to call Polizzi as a witness during the course of the trial. Caruth was given the opportunity to call adverse witnesses and actually did call one to the stand. At no time prior to or during the course of the trial did Caruth ever indicate a desire to call Polizzi as a witness. At the conclusion of the trial, the court asked Caruth if there was anything further to be presented, to

---

**8.** In any event, there has been no showing that the prison photocopy policy, described in note 1, *supra*, violates the required reasonable "time, place and manner" analysis of *Pell v. Procunier*, 417 U.S. 817, 826, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). The photocopy policy is content neutral and appears to further legitimate penological objectives unrelated to the suppression of expression.

which Caruth responded with an unequivocal "no." The trial court then announced its verdict. It was at this point that Caruth for the first time indicated a desire to call Polizzi as a witness. The court, understandably enough, denied Caruth's request. The fact that Polizzi was listed by the defendants as a potential witness in the court's pretrial order is irrelevant in light of Caruth's complete failure to express even the slightest desire to examine Polizzi during the course of the trial. We cannot conclude that the decision of the district court to deny Caruth's request to call Polizzi to the stand after the court had delivered its verdict was an abuse of discretion.

### V.

The final argument which we will address is Caruth's claim that he was denied due process of law by virtue of the fact that he was punished in violation of an existing prison regulation. The relevant regulation, Administrative Rule 804(G)(1), states in pertinent part:

> The hearing before the Adjustment Committee must be commenced *no more than 72 hours* after the commission of the chargeable offense or the discovery of it
> . . . .

(emphasis added). Caruth's violation of the prison photocopying policy was allegedly discovered by prison authorities in January of 1977. The required hearing on the violation did not occur until March 10, 1977. Caruth alleges that the failure of the prison authorities to comply with Administrative Rule 804(G)(1) constitutes a violation of due process. At trial, the district court failed to address the issue.

It is clear that in this case the alleged failure of the prison authorities to comply with the 72 hour rule is relevant to the issue of pretextual punishment. By itself, however, the failure to comply with the regulation does not amount to a violation of constitutional magnitude. Prison disciplinary proceedings such as this have never been considered part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does

not apply. *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). The requirements of due process do not impose such a 72 hour rule. *Carlisle v. Bensinger*, 355 F.Supp. 1359, 1362 (N.D.Ill. 1974). In this case, there is no evidence that the administrative action taken against Caruth did not fairly and rationally satisfy the concept of due process. *See Edwards v. Ill. Dept. of Corrections*, 514 F.2d 477, 479 (7th Cir. 1975); *Adams v. Pate*, 445 F.2d 105, 108 (7th Cir. 1971). The alleged failure of the prison authorities to comply with the 72 hour rule, while relevant to Caruth's claim of pretextual punishment, does not by itself amount to a constitutional violation.

### VI.

For the reasons discussed in this opinion, the judgment of the district court is Affirmed.