977 F.2d 585
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
James P. CLAYTON-EL, also known as Carmichael Morrison,
Plaintiff-Appellant,
v.
Lieutenant C. CARAWAY, Lieutenant R. Ticer, Correctional
Officer J.L. Chandler, et al., Defendants-Appellees.
 No. 90-2251.
 United States Court of Appeals, Seventh Circuit.
 Submitted July 24, 1992.*
Decided Oct. 6, 1992.
Rehearing Denied Oct. 28, 1992.
 
 Before CUMMINGS, POSNER and MANION, Circuit Judges.
 
 ORDER
 
 1
 James P. Clayton-El filed a pro se civil rights complaint under 42 U.S.C. § 1983 against various prison officials at the Menard Correctional Center for alleged violations of his constitutional rights. The alleged violations arose out of the investigation of a murder of one of the inmates at Menard. The district court granted summary judgment in favor of the defendants. We affirm.
 
 I.
 
 2
 We review de novo a district court's grant of summary judgment. In doing so, we view the facts in the light most favorable to the nonmoving party. Williams v. Anderson, 959 F.2d 1411 (7th Cir.1992).
 
 
 3
 On the morning of July 11, 1988, an inmate at the Menard Correctional Center was stabbed to death. Defendant Lieutenant Carl Caraway, an institutional investigator at Menard, investigated the stabbing. He visited Clayton-El in Menard's Health Care Unit where Clayton-El was being treated for a minor cut to his leg. He asked Clayton-El how he had sustained the injury. Clayton-El refused to say and refused to cooperate with the investigation in any way. Clayton-El then "smart-mouthed" Caraway and "cussed" him out to get rid of him. After Caraway left, defendant Lieutenant Russell Ticer came to tell Clayton-El that he had to place him under deadlock status. Clayton-El then overheard Caraway tell Ticer over the radio to deadlock Clayton-El in the segregation unit (as opposed to his cell). Clayton-El was placed in investigative segregation that day and remained there until August 11, 1988.
 
 
 4
 Clayton-El was not allowed to take his personal property with him to segregation. This property included, among other things, soap, a toothbrush, clothes, legal materials, a typewriter, pens, fans, and reading material. His property, minus some items, was eventually given to him in segregation on July 15.
 
 
 5
 At the time, Clayton-El had pending a petition for habeas corpus with a court date scheduled for July 15. Because of his placement in segregation and the withholding of his legal materials, he was unable to file several motions on that date. Specifically, Clayton-El was unable to file an amended habeas petition, an amended motion for summary judgment, and a motion to "rid himself of appointed counsel." Clayton-El was also denied access to the prison law library on July 11 because all the allotted spaces for segregation inmates were filled on that day. At the hearing on July 15, which Clayton-El's appointed counsel attended, the court granted a continuance to file an amended habeas petition.
 
 II.
 A.
 
 6
 Clayton-El claims that, by placing him in segregation, Caraway and Ticer violated his Fourteenth Amendment right not to be deprived of liberty without due process of law.
 
 
 7
 The due process clause of the Fourteenth Amendment does not itself create a liberty interest in remaining in the general prison population and out of temporary confinement. Hewitt v. Helms, 459 U.S. 460 (1983). But a state may create a protected liberty interest by enacting certain statutory or regulatory measures. Id. at 469. A state creates a protected liberty interest when the statute or regulation
 
 
 8
 use[s] language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed, and that administrative segregation will not occur absent specified substantive predicates.
 
 
 9
 Id. at 471-72 (citation omitted).
 
 
 10
 Relying on circuit precedent, the district court reasoned that Illinois law did not create a liberty interest in remaining in the general prison population, and thus Clayton-El's placement in segregation did not violate his constitutional rights. Clayton-El argues that the court erred by focusing on whether he had a liberty interest in remaining in the general prison population. According to Clayton-El, the relevant issue is whether he was confined in violation of 20 Ill.Admin.Code § 504.40(a).[1]
 
 
 11
 The first step in examining a procedural due process claim is to ask "whether there exists a liberty or property interest which has been interfered with by the State." Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 460 (1989). Covering all bases, Clayton-El cites two district court cases, Pardo v. Hosier, 611 F.Supp. 693 (C.D.Ill.1985), and Jackson v. Lane, 611 F.Supp. 933 (N.D.Ill.1985), in support of the position that inmates do have a liberty interest in remaining in the general prison population. These cases fail to persuade us. First, we reversed the district court's decision in Pardo. Pardo v. Hosier, 946 F.2d 1278 (7th Cir.1991). Second, Jackson did not involve § 504.40(a), the provision Clayton-El claims creates a liberty interest.[2] In contrast, in Woods v. Thieret, 903 F.2d 1080 (7th Cir.1990) (per curiam), we considered and rejected a claim that § 504.40(a) creates such a liberty interest. We noted that the three considerations that go into deciding whether to place an inmate in temporary confinement (the "substantive predicates" in the words of Hewitt ) left discretion with the shift supervisor so that they did not mandate any particular outcome. We concluded that, while § 504.40(a) uses certain mandatory language, it did "not place sufficient substantive limits on official discretion to establish a liberty interest in avoiding temporary confinement." Id. at 1083.
 
 
 12
 Clayton-El nevertheless argues that § 504.40(a) mandates that the "shift supervisor" determine whether or not to place an inmate in investigative status, and that since neither Caraway nor Ticer were shift supervisors entitled to make that decision, his right to due process was violated. This argument is unavailing. "[W]e have repeatedly rejected the notion that any and all state prison rules and regulations containing [mandatory] language automatically create 'legitimate claims of entitlement' triggering the procedural protections of the due process clause." Colon v. Schneider, 899 F.2d 660, 667 (7th Cir.1990). It would be absurd to say that a regulation like § 504.40(a), which creates no liberty interest in remaining in the general prison population, nevertheless provides an inmate with a liberty interest in having a particular prison official make the determination to move him to segregation.
 
 
 13
 Clayton-El also argues that he was placed in segregation in retaliation for refusing to cooperate with the investigation and for "smart[-]mouthing Caraway and cursing him out." Plaintiff's Br. 14. Clayton-El's conclusory assertion that he was detained for refusing to cooperate with the investigation cannot defeat summary judgment. Caraway was justified in believing that Clayton-El may have been involved in the murder: Clayton-El had sustained a cut on his leg the same morning of the stabbing, but he told Caraway that he did not know how he received it. R.Doc. 19, Caraway Aff., pp. 1-2. Given this evidence of Clayton-El's possible involvement, Clayton-El was clearly subject to segregation pending the investigation. Hewitt, 459 U.S. at 468 (segregation for investigatory purposes "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.").
 
 
 14
 With respect to Clayton-El's free speech claim, it appears from the record that Clayton-El was placed in segregation for investigatory purposes, not for retaliation. But even if retaliation were among the reasons for his placement there, he fails to state a viable First Amendment claim. It is true that prison officials cannot retaliate against prisoners for exercising their constitutionally protected right to free speech. Matzker v. Herr, 748 F.2d 1142, 1150 (7th Cir.1984). However, Clayton-El cites no authority for the proposition that "smart-mouthing" and "cursing" at prison guards are forms of speech that enjoy protection under the First Amendment.
 
 
 15
 Under IDOC regulations, a prisoner may be disciplined for "insolence," defined as "[t]alking, touching, gesturing, or other behavior which harasses, annoys, or shows disrespect." Section 504.Table A 304.[3] This regulation clearly limits certain speech that would be protected outside the prison context. But as the Supreme Court has stated, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). Several factors determine a regulation's reasonableness: 1) whether there is a "valid, rational connection" between the prison regulation and the governmental interest advanced to justify it; 2) whether inmates have available to them alternate means of exercising the right; and 3) the impact the asserted constitutional right will have on guards and other inmates. Id. at 89-90.
 
 
 16
 In light of these factors, the IDOC regulation against insolence is clearly valid. First, there is certainly a rational connection between a rule against insolence and the fundamental penological interest of maintaining order. Second, Clayton-El could easily express his refusal to cooperate without showing disrespect. And third, allowing inmates to behave insolently towards guards would clearly undermine the guards' ability to do their jobs. Thus, even if Clayton-El were placed in segregation for "smart-mouthing" and "cursing" at Caraway, we find no violation of Clayton-El's right to free speech.
 
 
 17
 The district court properly granted summary judgment for the defendants on Clayton-El's claim that he was placed in segregation in violation of his constitutional rights to due process and freedom of speech.
 
 B.
 
 18
 Clayton-El claims that the defendants deprived him of his right to meaningful access to the courts. He bases this claim on the withholding of his legal materials for several days prior to a court hearing on his pending habeas petition and his denial of access to the prison law library during one of those days.
 
 
 19
 Prisoners have a fundamental constitutional right of access to the courts. This right of access "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds v. Smith, 430 U.S. 817, 828 (1977). Here, Clayton-El had court-appointed counsel. Although the state is not constitutionally required to provide an indigent civil rights plaintiff with an attorney, see Caruth v. Pinkney, 683 F.2d 1044, 1048 (7th Cir.1982) (per curiam), cert. denied, 459 U.S. 1214 (1983), doing so satisfies a prisoner's right of access to the courts. See Quam v. Minnehaha County Jail, 821 F.2d 522, 523 (8th Cir.1987) (per curiam) (no denial of meaningful access to the courts when prisoner had regular access to court-appointed attorney).
 
 
 20
 Conceding that he had court-appointed counsel, Clayton-El claims that his counsel was constitutionally ineffective.[4] Although we see no basis in the record for this claim, we need not decide the issue. Since there is no right to court-appointed counsel in civil cases, there is no right to effective assistance of counsel in such cases. Wolfolk v. Rivera, 729 F.2d 1114, 1119-20 (7th Cir.1984). Thus, the district court did not err by granting the defendants summary judgment on Clayton-El's access-to-court claim.
 
 C.
 
 21
 Clayton-El argues that the defendants deprived him of his property without due process of law when they moved him to segregation. He claims that his property was intentionally withheld from him for four days, and that after his property had been returned he discovered that some of his things had been given to other inmates. R.Doc. 18, pp. 6-7.
 
 
 22
 Clayton-El does not allege that the defendants acted pursuant to established state procedure. In fact, he repeatedly asserts that the defendants acted contrary to IDOC rules and regulations concerning the taking of a prisoner's property. Plaintiff's Br. 4-7, 13, 18. Thus, we take Clayton-El to be claiming that the defendants' actions were random and unauthorized. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 435-36 (1982) (distinguishing between a tortious loss of property that is the result of a "random and unauthorized" act by a state employee and one that results from an established state procedure.).
 
 
 23
 An intentional deprivation of property by a prison official, though random and unauthorized, does implicate the due process clause--but only when the state provides no meaningful post-deprivation remedy for the loss. Hudson v. Palmer, 468 U.S. 517 (1984). The Illinois Court of Claims provides just such a remedy. See Ill.Rev.Stat., ch. 37, para. 439.8(d) (1989). Thus, Clayton-El's property-loss claim fails to implicate the due process clause, and the district court properly granted summary judgment for the defendants on this issue.
 
 D.
 
 24
 Finally, Clayton-El argues that it was improper for the district court to grant summary judgment in favor of the defendants because discovery was not complete. Clayton-El had requested that the defendants provide: 1) official records on the stabbing incident, 2) the victim's medical records, 3) Clayton-El's master file, and 4) various IDOC rules and regulations. With these materials, he hoped to prove
 
 
 25
 that the victim inmate Harris was dead before arrival at the hospital unit and never identified any attacker as having stabbed him, anyone nicknamed "Paper" or Wynn ... and ... that the defendant Caraway was lying in his affidavit and had no knowledge of who the victim's attacker(s) was [sic] or of appellant having committed any infraction of the prison rules.
 
 
 26
 Plaintiff's Br. 12.
 
 
 27
 Summary judgment is appropriate if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 28
 By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
 
 
 29
 .... Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.
 
 
 30
 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).
 
 
 31
 Given our analysis of the legal issues raised on appeal, none of the facts Clayton-El hoped to discover are material; that is, they would not and could not affect the resolution of the legal issues. Thus, the district court did not err by granting summary judgment despite the fact that discovery was not complete. See Gieringer v. Silverman, 731 F.2d 1272, 1277 (7th Cir.1984) (the nonmovants "have failed to indicate how further discovery that they might conduct could elicit evidence that would enable them to resist summary judgment.").
 
 III.
 
 32
 Clayton-El mentions in passing several other alleged violations of his constitutional rights. Even construing his briefs liberally under Haines v. Kerner, 404 U.S. 519 (1972), we find that he has failed to adequately develop any arguments relating to these issues. He has therefore waived these issues on appeal. United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir.1991).
 
 IV.
 
 33
 Based on the foregoing reasons, the judgment of the district court granting summary judgment in favor of the defendants is AFFIRMED.
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). Plaintiff-appellant filed a statement requesting oral argument. Upon consideration of that statement, the briefs, and the record, the request for oral argument is denied and the appeal is submitted on the briefs and the record
 
 
 **
 Magistrate Judge Gerald B. Cohn presided over this case with the consent of the parties pursuant to 28 U.S.C. § 636(c)
 
 
 [1]
 Section 504.40(a) provides in part:
 The shift supervisor shall determine whether or not it is necessary to place the committed person in investigative status or in temporary confinement status pending a disciplinary hearing or a determination whether or not to issue a disciplinary or investigative report.... The decision to place a committed person in temporary confinement may be based, among other matters, on:
 1) The aggressiveness of the committed person;
 2) The threat posed to the safety and security of the facility;
 3) The need to restrict the committed person's access to general population to protect him from injury or to conduct the investigation; and/or
 4) The seriousness of the offense.
 
 
 [2]
 Clayton-El also relies on People ex rel. Taylor v. Franzen, 417 N.E.2d 242 (Ill.App.1981). Franzen is irrelevant for several reasons: 1) it does not involve § 504.40, 2) it is a state court interpretation of state law and thus does not stand for the proposition that prisoners have, under the due process clause, a liberty interest in remaining in the general prison population
 
 
 [3]
 Clayton-El does not challenge this regulation. However, since this regulation authorizes the imposition of segregation for the type of speech Clayton-El directed at Caraway, an analysis of its constitutionality will resolve Clayton-El's retaliation claim
 
 
 [4]
 Although Clayton-El does not specifically state that his counsel was ineffective in the constitutional sense, we liberally construe his pro se pleadings to make this claim. Haines v. Kerner, 404 U.S. 519, 520 (1972)